# WHEELING.

## HERALD v. BOARD OF EDUCATION.

Submitted June 10, 1908.   Decided June 11, 1909.

1. SCHOOLS AND SCHOOL DISTRICTS—*Lease of School Lot—Action to Annul.*

   Residents and tax payers in a school district, being patrons of a free school therein, suing for themselves and all others similarly circumstanced, may sustain a chancery suit to annul a lease of a school lot for oil and gas, as unauthorized and void,

made by a board of education, and enjoin the use of the lot for such purpose. (p. 767.)

2. SAME—*Board of Education—Power to Contract.*

A board of education is a *quasi* public corporation, existing only under statute, having only the powers given by statute and such implied powers as are absolutely necessary to execute such express powers. It cannot engage in business or make contracts outside its functions touching education. It cannot lease a school house lot for production of oil and gas. (p. 769.)

Appeal from Circuit Court, Harrison County.

Bill by John Herald and others against the Board of Education and others. Decree for defendants, and plaintiffs appeal.

*Reversed.*

DAVIS & DAVIS and W. S. MEREDITH, for appellants.

DOUGLASS & STEPTOE, JOHN BASSELL, JAS. A. MEREDITH, and E. M. SHOWALTER, for appellees.

BRANNON, JUDGE:

By deed dated 29th August, 1892, Isaac N. Harbert and others conveyed to The Board of Education of Sardis District and their successors in office, sixty-five poles of land, in Harrison county, "for the purpose of building a school house on the same for the benefit of free schools." The parcel of land is in use for free school purposes. It is used as a site for a school house, which is in actual use as a school house. The board of education passed a resolution, 27th May, 1907, authorizing a lease to W. J. Rowland and F. L. Grove of the lot for the purpose of the production of oil and gas, and under that resolution the president of the board made a lease of the lot to Rowland and Grove for the purpose of the production of oil and gas for one year and as long thereafter as oil or gas either should be produced from the lot. In July, 1907, John Herald and several others suing for themselves and other residents, citizens and tax payers of said district, brought a chancery suit against the board of education and Rowland and Grove stating that the plaintiffs were residents within School District No. 20 in the District of Sardis, and were tax payers within that district, and that they were patrons of the free school within that district, and that

the said lot was situate within sub-district No. 20, and that children of the plaintiffs attended school on the said lot, and alleging that the said lease was unauthorized and beyond the power of the board to make and seeking to have it annulled as illegal and void.   They prayed that said lessees be enjoined from using the said lot for the development of oil and gas.   A provisional injunction was granted; but later a decree was pronounced declaring that the board of education had authority of law to execute the said lease, and that the lessees under it had authority to bore for oil and gas on the said lot, and to produce oil and gas therefrom, provided that in so doing their operations should not interfere with, disturb or prevent the orderly conduct of the public school in session at any time during such oil productions, and that such school was not then in actual session, and would not be until later in the year.   Thereupon it was decreed that the injunction be so modified and dissolved to such an extent as to admit Rowland and Grove to proceed with operation until the school in the district should begin, and that thereafter such operation should be conducted only before and after school hours and not while the school was in session or while such school house and lot were in actual use during school hours for school purposes.   The plaintiffs appeal to this Court.

This is a very important case.   It involves the power of a government corporation performing the most important function to divert public property to uses other than those contemplated by law.

The defense contests the right of the plaintiffs to interfere in the action of a public board.   They say that the board has title, and the plaintiffs have no interest.   But these people are the very persons most deeply and clearly interested in the use of the lot for school purposes for their children.   It is said no individual can enjoin a public nuisance, unless he has a special interest affected.   *Talbott* v. *King,* 32 W. Va. 6.   But these plaintiffs have a direct, immediate, practical interest as parents.   Are they to wait for the county superintendent or attorney-general to act?   Who will surely vindicate their rights which they surely have?   I quote the following from Spelling on Extra. Relief, sec, 684:  "The letting of property belonging to a municipal corporation for any unauthorized uses will be enjoined at the suit of resident tax payers; and the use of a

school house for religious worship, when not expressly author-
ized, is held to warrant the granting of an injunction to restrain
the officers of the school district from permitting such use at
the suit of a tax payer, without his showing special damage,
since he is without means of redress at law.    School officers
may be enjoined from leasing a public school house for the pur-
pose of keeping a private school, and the use of a public school
house for private purposes, such as the holding of religious or
political meetings, social gatherings and the like, is unauthor-
ized by law and may be restrained at the instance of any party.in-
jured thereby; and this, though a majority of the electors and
tax payers of the District assent to such use and an adequate
rental is paid therefor; and it is immaterial in such case that
the majority of the citizens and the Directors of the District have
consented to the illegal use."   "A tax payer or property owner
has also the undoubted right to prevent by injunction public au-
thorities from wasting or disposing of public property, or to re-
strain the diversion or misappropriation of public property which
a public corporation holds, acquired either by private gift or
through the use of public money, as a trust for special uses and
purposes.    This right in some states is definitely given by stat-
ute.    In accord with this same principle, it has been held in
many, many cases that private persons may oppose and prevent
the making of illegal contracts which involve the use of public
monies or property, or the granting of licenses or privileges by
public legislative bodies, which, although without their discre-
tionary powers, yet in effect result in a waste, misappropriation
or misuse of public funds or property."  3 Abbott Munic. Corp.
sec. 1158.    These parents and tax payers are, before all others,
most seriously affected in this case.    In *Bull* v. *Read,* 13 Grat.
47, inhabitants suing for themselves and other inhabitants were
allowed to sue to test an act to establish free schools against the
school commissioners appointed under it.    The authorities there
collected will warrant the right to sue in this case.    In *Shinn* v.
*Board,* 39 W. Va. 497, citizens and tax payers were allowed to
sue to enjoin payment of drafts issued by a board of education.
In *Osburn* v. *Stealey,* 5 W. Va. 85, tax payers and residents en-
joined the removal of public records from Shepherdstown to
Charlestown.    A resident and a tax payer is allowed to sue to

prevent diversion to private use of land dedicated for town site. *Davenport* v. *Buffington,* 97 Fed. (C. C. A.) 234.

Is that lease valid? That depends upon the power of the board of education to make it. A board of education is a public corporation having its birth and existence by statute. Code, chapter 45, section 7. The board of education is not a corporation vested with general powers of a business corporation. The books call it rather a *quasi* corporation. 27 Am. St. R. 412. It is a public corporation, in that it is a part of the governmental structure and performs an important function in the body politic in the administration of government, a government agency. "School districts are organized under the general laws of the State and fall within the class of corporations known as *quasi* corporations. Civil corporations are of different grades or classes, but in essence and nature they must all be regarded as public. The *school-district or the road district* is usually invested by general enactment operating throughout the State with a corporate character, the better to perform within and for the locality its special function, which is indicated by its name. It is but an instrumentality of the State, and the State incorporates it that it may the more effectually discharge its appointed duty. So with *counties.* They are involutary political or civil divisions of the State, created by general laws to aid in the administration of government. * * * * * Considered with respect to the limited number of their corporate powers, the bodies above named rank low down in the scale or grade of corporate existence; and hence have been frequently termed *quasi* corporations. This designation distinguishes them on the one hand from private corporations aggregate, and on the other from municipal corporations proper, such as cities or towns acting under charters, or incorporating statutes, and which are invested with more powers and endowed with special functions relating to the particular or local interests of the municipality, and to this end are granted a larger measure of corporate life." 1 Dillon Munic. Corp., secs. 24, 25. Their functions are assigned by our statutes. They have no other than those so assigned, and those necessarily implied—I say necessarily implied—because essential to carry out the functions assigned—mere creatures of the statute for the performance of functions specified by the statute.

We ventured to say in *Shinn* v. *Board of Education*, 39 W. Va. 498, that "The Board of Education of a school-district is a corporation created by statute with functions of a public nature expressly given and no other; and it can exercise no power not expressly conferred or fairly arising from necessary implication, and in no other mode than that prescribed or authorized by the statute." In *Honaker* v. *Board of Education*, 42 W. Va. 170, we repeat that doctrine, saying that such a board had only the power necessary to carry out its public functions, and that it could exercise no power not expressly conferred or fairly arising by necessary implication. In *Pa. L. R. Co.* v. *Board of Education*, 20 W. Va. 360, this Court held that "Corporations created by statute must depend, both for their powers and the mode of exercising them, upon the true construction of the statute creating them." That case says that we must look at the purpose of the statute under which a board of education is to act. We must see what purposes its formation were intended to accomplish. Such is our law, under our own decisions. Are they consonant with the general law? "School districts are usually vested with the power of making contracts in relation to school matters." 25 Am. & Eng. Ency. L. 44. That says "in relation to school matters." It does not mean that such a board is a business corporation. That it can mine, manufacture, produce, barter and trade, things utterly foreign to the object of its formation. It cannot lease land held by it though it has the fee simple legal title, but solely and only for the purpose of a school house. It cannot lease it for money making, because the statute provides for the accomplishment of its object by taxation, not by negotiation in the business world. "Contracts made by the directors and trustees are binding upon the district when made within their authority." 25 Am. & Eng. Ency. L. 58. We find in 2 Smith on Munic. Corp., sec. 1434, that school trustees "can only act within the power prescribed by statute, and the liberty of action of executive officers of private corporations is not accorded to such trustees." Speaking of boards of education we find in 3 Abbott on Munic. Corp., sec. 1080, this language: "In common with the grant of powers to all subordinate and public *quasi* corporations, the rule of law applies of strict construction and a consequent limitation of the rights which may be exercised

by them and the duties which they can legally perform." Very narrow powers are assigned them in note 3, 1 Dillon on Munic. Corp., sec. 24. "At the present time the purpose of the organization of agencies of government seems 'to be incorrectly understood; the tendency being toward the idea that a public corporation should not only perform its functions as an agency of government but should also supplant private enterprises, thrift and responsibility. The organic, legal and proper purpose should control the right of a public corporation to acquire property and this is especially true when considering the power of the corporation in its capacity as such to secure, hold and dispose of property. Clearly the power of a public corporation to thus acquire property is limited to the existence of the right or power based upon the purposes for which it is to be used, and although the state in its sovereign capacity is sometimes less controlled by this consideration, yet, the principle should never be forgotten when the question of the power of one of the subordinate agencies of government to acquire property is at issue. Such an agency should not be permitted to secure property for any purpose other than a public one and then only when the power has been expressly given or is necessarily implied as essential to the life of the corporation or the carrying on of the particular governmental object for which it was organized. The general authority, whether expressly or impliedly existing to acquire and hold property, should be limited to the purposes of the organization of the particular corporation and never construed as including those enterprises involving speculation or profit. These principles can be applied to the various existing subordinate corporations. They are organized for the performance of specific governmental duties. Counties, school districts, road districts, library or educational boards, park commissions, municipal corporations proper and others, are each created with the idea that they shall carry out effectually some act included within the governmental power. Each one of these corporations may acquire, under grant of express power or the existence of the implied one above suggested, property which is to be used only for the purpose germane to the object for which the particular governmental subdivision was organized. The restricted and limited power of public corporations as governmental agencies cannot be too

strictly maintained and ·strongly urged." 2 Abbott on Munci. Corp., sec. 718. "An unauthorized or illegal contract executed by a public corporation, is incapable of enforcement. It is absolutely void, and neither the doctrine of estoppel nor ratification can be invoked to maintain it. The strict rule of law applying to *ultra vires* contracts of corporations, as followed by the English Courts and the Federal decisions in this country is strictly applied to the acts of public corporations." 1 Abbott on Munic. Corp., sec. 258. Under these authorities whence comes the power of this board to lease perhaps for many years this lot? Counsel for the board tell us that many powers are given a board of education by the statute. That very fact affords an argument to show that such a corporation is limited to the specified powers. But counsel say that among those powers under the statute is one which would justify this lease in the language, "Said board shall receive, hold and dispose of according to the rules of law and intent of the instrument conferring title, any gift, grant, devise or bequest made for the use of any free school." That clause uses the words "according to * * * the rules of law and the intent of the instrument conferring title." What rules of law? The law of the being, of the nature, of the object of the board's existence, and perhaps the law of section thirty-three, below mentioned, giving power to sell for money and it to go into the building fund for other school houses to be built. Some cases as to right of disposition in private owners under certain instruments do not apply when considering the power of a limited public corporation. So, some cases as to leases by municipal corporations. Their powers are wider than those of a board of education. Now, the deed conferring title in this case says that the lot is conveyed for the use of free schools. That would seem to say that the lot must be retained for that purpose. So far as it goes that language tends in that direction; but I do not place great stress on that language in the deed; for I am ready to say that the board could dispose of that lot, if it would prove unsuitable and put its proceeds into another lot. That would be in subservience to the trust upon which the lot is held. I do not deny the power of the board to even dispose of the lot, so it be in furtherance of education and appropriate to the execution of the duties of the board in the work of education. That is the

object of that grant of power. It does not mean that it can divert the lot from school purposes to purposes foreign to that object, no more than it could divert the taxes paid by the people to utterly different and foreign purposes. In connection with the words relied on by counsel for such power in the board we must not forget section 33, chapter 45, of the Code. It provides that the president of the board shall examine the school houses and sites and report their condition to the board. Such as are in their judgment properly located and sufficient, or can be rendered so, shall be retained and the remainder, with the consent of the county superintendent, be sold by the board, but the statute provides carefully that the proceeds shall be added to the building fund. There is a limitation upon the power of disposition. The sale must be for money, and the money go into the building fund. That does not contemplate a lease for oil. Here the board has made a partial sale, but not such as the statute contemplates. How utterly foreign to the purposes of eduction is the leasing of this lot for oil. The lot is very small. It is true the decree provides that work shall not go on to the disturbance of the school; but there might be an explosion of gas while the children were in the school, thus endangering their lives, though no actual operations were going on. The lessees might violate these restrictions. The lease gives the lessees power to mine, lay pipe lines, build tanks, station or other structures on the lot to take care of oil and gas. Thus this little lot might be filled with greasy, unsightly oil tanks and other structures occupying the ground rendering it unsightly and useless for the children as a play ground, and exposing them to strangers and destroying privacy—in other words, practically destroying its usefulness, as we can readily see, for free school purposes. Did the Legislature ever intend to vest any such power in a school board? If such boards may wield such powers, where is the limit, and how far may it not frustrate the whole purpose of the ownership of the board? We are told that the board has the legal title in fee simple. So it has, but it is not a private owner, because it holds such title in trust for these plaintiffs and their children, and for those that may come after them. I can scarcely imagine a use to which this lot could be put more foreign to the purpose for which the law has invested the board with title. Such

are the limitations of power of this board by law, and the lessees were bound to know thereof. "Persons dealing with a corporation must take notice of what is contained in the law of its organization, and must be presumed to be informed of the restrictions annexed to the grant of power by the law by which the corporation is authorized to act." *Smith* v. *Cornelius*, 41 W. Va. 59; *Clarksburg Electric Co.* v. *City*, 47 *Id*. 739. "All persons dealing with school officers are presumed to do so with full knowledge of the limitations of the power of these officers to bind their corporations under the particular contracts." 25 Am. & Eng. Ency. L. 59.

*Bryant* v. *Logan*, 56 W. Va. 141, does not conflict with this decision. It held a lease by the city of Parkersburg of a part of a public park to a driving club for a few years for driving and racing purposes valid. The charter act expressly allowed the city to "let" its land in any case and in any manner in which it would be proper for a private person to do so. Moreover, the purpose of the lease was to afford amusement for the people in line with the purpose for which the city held the park, not a purpose foreign and inconsistent with such holding, as in this case. And moreover a municipality has wider powers than a mere board of education.

Until ch. 70, Acts of 1905, Code ch. 45, 333, provided that if the board should decide to sell a lot, the former owner should have right to buy it back, or to a reconveyance, if he had given it. Does not this tend to show that a school lot was not designed to be generally transferable? The fact that the act of 1905 omits this right of reclamation would not change the right of the original owner or the character of title in the board.

We therefore reverse the decree, annul the lease and perpetuate the injunction.

*Reversed.*

MILLER, PRESIDENT, (*dissenting:*)

I cannot concur in the opinion of the Court. While it is true the deed from Harbert, and others to the Board of Education, grants the land "for the purpose of building a school house on the same for the benefit of the free schools," the deed is in all respects a grant in fee, for valuable consideration, with covenants of general warranty, and without reservation or limitation. These

words of the grant are merely descriptive of the purposes for which the land was purchased, not a limitation upon the power of alienation incident to ownership—the *jus disponendi*. Under no circumstances could the land ever revert to the grantor.

Section 1621, Code 1906, provides that "boards of education shall hereafter, whenever practicable, obtain a general warranty deed for all school house sites;" that such boards might acquire all the rights incident to such ownership. The deed referred to is such a deed, although acquired prior to the time this provision became a part of section 1621.

With good indefeasible fee simple title thus invested in said board if authorized by law, can there be any question as to its right of sale or other disposition of the property? The only provision of the statute having application to the subject I think, is contained in section 1567, Code 1906, which is: "Said board shall receive, hold and dispose of according to the rules of law and the intent of the instrument conferring title, any gift, grant, devise or bequest, made for the use of any free school or schools under their jurisdiction; and without any transfer or conveyance, shall be deemed the owner of the real and personal property in their district, and the property of the former township or district, for which their district was substituted." It will be observed that this law not only gives right to hold but also *to dispose* of property acquired by such board. In the language of the Supreme Court of the United States, "the expression 'to dispose of' is very broad and signifies more than 'to sell.' Selling is but one mode of disposing of property." *Phelps* v. *Harris*, 101 U. S. 370. And again: "When a contract respecting property contains an agreement to be performed by the owner of it when he shall 'dispose of or sell it,' it is obvious that the words 'dispose of' are not synonymous with the word 'sell;' and their meaning must be determined by considering the remainder of the contract." *Hill* v. *Sumner*, 132 U. S. 118. In *United States* v. *Gratiot*, 35 U. S. 526, the same court held that Article 4, section 3, of the federal constitution, which provides that Congress shall have power *to dispose of* and make all legal rules and regulations respecting the territory or other property belonging to the United States, not only vests in Congress the right to sell the lands belonging to the United States, but also to *lease* the

same.   In this case, a lease by the President under regulations provided by Congress authorizing him to *dispose* of the lands of the United States, was held valid.   Many other cases might be cited where these words, as used in legislative grants, deeds, wills and other contracts have been given like construction.   3 Words & Phrases, 2114.

Having title, and power of disposition, and in the language of the statute "deemed the owner of the real and personal property of their district," can it be possible that a board of education, because it is a board is so surrounded by legal barriers, and limitations on its powers that it cannot lawfully preserve the property of which it is so possessed, and to which it is entitled.   To so hold would be inconsistent with every rule and right of property and render it practically powerless to preserve the most valuable part of the property from encroachment by adjoining owners.   In the resolution of the board authorizing the lease involved here, it is recited, that the lands immediately adjoining said lot are being drilled and operated for oil and gas, some of the wells being productive of oil and gas; that a well was then being drilled, very near the line of said lot; that said school house lot in all probability is underlaid with oil and gas, which will likely be exhaused and taken away through wells drilled and being drilled on adjacent land to the damage and loss of said board of education and tax payers of said district, unless their interests are protected; that in the judgment of said board it will promote the interests of the citizens and tax payers of said district to have said lot drilled and operated for oil and gas upon the usual terms upon which such lands are usually operated.   Here. we must assume is a rich and valuable mine underlying this school house lot.   If oil and gas exist there it is as much the property of the owners of the soil, as the earth, rock, or any other mineral or mineral substance existing there.   Is the school board to stand by with its hands tied, powerless to protect the public property in its keeping and allow adjoining owners and lessees to drain the public land of this valuable product?   The statute has imposed no such limitation upon its powers.   Suppose in place of oil, it was a stone quarry, or a gold mine, or timber, or some other product of the land, would not this board on the principles of the opinion be powerless to utilize the wealth thus found

imbeded in the public land? It certainly would be. I think the statute not only expressly but impliedly gives this board ample power to lease this property. This ought especially to be so where the product, as in this case, is oil and gas, fugitive in nature and which will be drained and carried away by operations on adjoining lands.

It is unnecessary to go into any general discussion of the authorities discussed in the opinion, on the proposition that boards of education, and other municipal or *quasi* municipal and public corporations, cannot enter on enterprises, or engage in business outside of the scope of their authority, or divert the public property to private use. The controlling question here is, had this board the power to preserve the public property, invested in it, from deportation and spoliation by others? I think there can be no question that it had such power. If we regard the oil and gas surplus property, not needed for school purposes, and proper to be disposed of and the money covered into the proper fund, section 1621, Code 1906, would seem to give ample authority therefor. True that section says the disposition of such surplus property shall be with the consent of the county superintendent. If his consent is necessary in a case like this the bill makes no allegation that such consent was not obtained.

Many authorities hold that a municipal corporation may lease rooms in public buildings, not occupied or necessary to be occupied, for municipal purposes. *Worden* v. *New Bedford,* 131 Mass. 23. And this Court has held in *Bryant* v. *Logan,* 56 W. Va. 141, that a municipality without infraction of its municipal powers might lawfully lease and let to private individuals a large portion of a public park for horse racing purposes, to the exclusion of the public in general. If public property may be thus diverted by municipal authority why, upon like principles, under the circumstances here disclosed may not the power given to dispose of public property be exercised for the preservation thereof? The authority to do so, I think is expressly given by the statute. For these reasons I must withhold my concurrence in the opinion.