## Williams, et al. v. McKenzie.

(Decided February 19, 1924.)

## Appeal from Johnson Circuit Court.

1.  Schools and School Districts—School District Held to Take Conditional Fee, Though Reverter Provided for, and could Execute Oil Lease.—Where one conveyed land to a school district "to have and to hold the same, with all the appurtenances thereof, to the second party, to their heirs and assigns forever, with covenants of general warranty," but after the description of the property provided that it should revert back to the grantor when no longer used for common school purposes, a determinable or qualified fee was created, and the school district had the right and power to execute an oil lease on the land as long as it was used for common school purposes.

2.  Schools and School Districts—School Lands May be Leased for Production of Oil.—Oil leases may be executed on school lands under Kentucky Stats., 1915, section 4437.

HOWES & HOWES for appellants.

WHEELER & WHEELER for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—
Reversing.

On the 29th of August, 1895, appellee W. H. McKenzie and one Melvin Fyffe conveyed to the trustees of common school district No. 8 of Johnson county a tract of land of less than one acre, about one-half of which was from the property of appellee, and the other half from that of Fyffe.

The conveyance was made "in consideration of their respect for the system of common schools of Johnson county," and was absolute on its face except as hereinafter pointed out. The habendum clause is, "to have and to hold the same, with all the appurtenances thereon, to the second party and their heirs and assigns forever, with covenants of general warranty."

However, after the description of the property, there is appended the following: "It is expressly understood that the aforesaid property is to belong to the aforesaid school district so long as it is used for common school purposes, but whenever the same is no longer so used it is to revert back to the parties of the first part, and the party of the second part is to have the right to remove the school building and fixtures on said premises."

As indicated in the face of the instrument the property conveyed had been probably for some years before the conveyance used for school purposes; at any rate a schoolhouse was erected on it, and it has been continuously used for school purposes at all times since that day, and is yet so used.

Thereafter by operation of law the title so held by the common school district became vested in the county board of education, and in November, 1920, the board of education in consideration of $50.00 and the customary royalty leased the same for oil and gas development to the appellant Junior Oil Company. Thereafter the latter under the lease drilled a well on that part of the school lot formerly belonging to appellee McKenzie, and brought in thereon a producing oil well, whereupon in December, 1921, McKenzie instituted this equitable action seeking to cancel the deed of August, 1895, and the lease so made by the board, and to have it adjudged the title thereto was in him, and to enjoin the oil company from entering upon the same, or using or claiming the same, and asking for an accounting for the oil taken therefrom.

The original petition alleges in substance that the board of education had no right or authority to make the lease to the oil company for oil and gas development, and that the oil company had moved on to the property for the purpose of developing the same for such purposes, and asserting the right so to do, whereby a cloud was cast upon plaintiff's title. It is further alleged that the board of education had title to such lot only for the purpose of conducting thereon a common school for educational purposes, and that the conversion of same by it to commercial purposes was equivalent to an abandonment by it of the original purpose for which the grant was made, and by such acts it abandoned the property for the original purpose, whereby the title to same reverted to plaintiff.

In an amended petition it is alleged that the oil company acting under its lease from the board of education had entered upon that portion of the land so conveyed by him to the school trustees, and without right or authority constructed thereon certain lines designated for use in pumping the oil from the well and conducting the same to tanks on adjoining property, and that such use is an additional servitude to that for which the deed was executed and upon his reversionary interest therein, and

that such acts were wrongful and without authority from, and against the will and consent of the plaintiff.

A demurrer was filed to the petition, which was overruled, and thereafter the defendants filed a joint answer, counterclaim and cross-petition, in which after denying the material allegations of the petition, they allege in a separate paragraph that at all times since the execution of the deed in 1895 by plaintiff the lot has been used exclusively for common school purposes and is now being so used, but that the school building thereon is more than thirty years old, is worn out and dilapidated and no longer suitable for the purposes for which it was erected. In another paragraph it is alleged that under the deed in question the school is the absolute owner of a defeasible fee simple title in the property therein conveyed, subject to be defeated only by one contingency, and that was a possibility of the cessation of the use of the property for common school purposes, and which contingency has never yet happened, and until it does happen, if ever, defendant is entitled to the full, complete and unrestricted use and enjoyment of the occupancy of the premises as if there was no possibility of reverter.

On submission the court adjudged that the plaintiff was the owner of and entitled to the oil extracted from the premises so conveyed by him, but adjudged the oil company a lien against the oil produced therefrom to cover its expenses in equipping, drilling and pumping the same. The counterclaim and cross-petition was dismissed except in the respect indicated, and the lease given by the board of education to the oil company was cancelled. To this judgment the defendants each excepted, and the plaintiff excepted to so much thereof as adjudged the oil company a lien upon the output from the well, but no cross-appeal has been prosecuted.

It will be observed that by the deed of August, 1895, appellee parted with his whole interest in the property; he made no reservation or exception, nor was there a condition or restriction of any nature upon the present title conveyed. He only provided that the title so conveyed should revert to him in the uncertain event that the property should ever cease to be used for common school purposes. He provided only for a mere possible reverter to himself if the property should ever cease to be used for such purposes.

The questions, therefore, which it seems necessary to determine are:

1.   What estate did the grantees take in the deed of 1895, and what are their rights in the property while the same is still being used for common school purposes?

2.   What estate, if any, remains in the grantor under that deed while the same continues to be used for common school purposes, and has he such a right or interest during that time as authorizes him to maintain an action for waste?

3.   Have the school authorities owning property in use for school purposes the right or power to lease the same for mineral development purposes, the funds, if any, derived therefrom to be used for schools?

Questions one and two are in effect one and the same, for if the grantees in the deed took such estate as entitles them to the unrestricted use of the property before the reversion provided for takes place, then it is clear there is no such right or estate left in the grantor as entitles him to maintain an action for waste.

The grantor clearly parted with his whole present interest, and after parting with it engrafts upon the estate conveyed a possible reversionary interest in himself if the property should ever cease to be used for common school purposes, which is manifestly a thing which may or may never happen.  The thing which will operate as a reversion in the grantor is and can be only the action of the grantees themselves or their successors in title.

A qualified or determinable fee is defined in 10 R. C. L. 652, as follows:

"A qualified or determinable fee is an estate limited to a person and his heirs, with a qualification annexed to it by which it is provided that it must determine whenever that qualification is at an end.  Because the estate may last forever it is a fee; and because it may end on the happening of the event it is called a determinable or qualified fee."

Such an estate is defined in 21 C. J. 922, in the following way:

"Although distinctions have been made or discussed by some authorities, the terms 'base fee,' 'qualified fee' and 'determinable fee' are generally used interchangeably to denote a fee which has a qualification subjoined thereto, and which must be

determined whenever the qualification annexed to it is at an end. This estate is a fee, because by possibility it may endure forever in a man and his heirs; yet, as that duration depends upon the concurrence of collateral circumstances which qualify and debase the purity of the donation, it is therefore a qualified or base fee.''

Manifestly the estate passing under the deed in question is embraced by these definitions. The grantor parted with all present interest in the property and conveyed it to the grantees without limitation or restriction of title, with the lone qualification that if it should ever cease to be used for common school purposes the title should revert to him. In conveying such a title, with no other limitation or restriction, the grantor not only divests himself of all present title, but places the unlimited and unrestricted use and occupation of the property in his grantee until such time, if ever, the event happens which will determine the estate conveyed. Such an estate being one which may last forever, is from necessity, such a one as carries with it the unlimited right to use and control the property at all times before the happening of the event which will end the estate.

As said by Mr. Washburn (4th ed., vol. 1., p. 89) in discussing the incidents of a determinable fee:

"So long as the estate in fee remains the owner in possession has all the rights in respect to it which he would have if tenant in fee simple, unless it be so limited that there is properly a reversionary right in another, something more than a possibility of reverter belonging to a third person, when, perhaps, chancery might interpose to prevent waste of the premises.''

This quotation from Mr. Washburn was approved by this court in the case of Landers v. Landers, 151 Ky. 206, and the court in that case held there was no equitable waste where one only used the property in such way a prudent man would have used his own.

In 21 C. J. 923, in discussing the incidents of such an estate, it is said:

"Until its determination such an estate has all the incidents of a fee simple, and while this estate continues, and until the qualification upon which it is limited is at an end, the grantee or proprietor had

the same rights and privileges over his estate as if it was a fee simple. He has an absolute right to the exclusive possession, use and enjoyment of the land, and as complete dominion over it for all purposes as though he held it in fee simple."

In the case of Gannon v. Peterson, 193 Ill. 372, 55 L. R. A. 701, the title holders of a mere expectancy sought to restrain the holder of a determinable fee from waste in mining coal on the property in question. The court, after fixing the character of the estate held by the defendant, and after holding that he was liable, if at all, only for equitable waste, directed the lower court to dismiss the plaintiff's petition, and said:

"The most valuable use of this land is for mining the coal. Appellant has a fee simple estate, and to grant the contention of appellees we must hold that appellant must not have the greatest and most beneficial use and enjoyment of it, because it is possible that he may die without leaving children, and his fee be determined. It is also possible that all of the appellees may die before the appellant, and yet by the decree appealed from this valuable estate must be withheld from him who owns it, the funds arising from it kept under the control of the court, and appellant allowed the net interest resulting from such management. Such a course as this is not in unison with the idea of a fee in appellant, and not in keeping with the spirit of American institutions that favors the vesting of estates, opposes entailments, and endeavors to secure to the citizen the greatest immediate enjoyment of property consistent with law. The appellees believed that it would be best to have the mine continue, and the chancellor took the same view, and by his order assumed, through the receiver, perpetual supervision over it. In the light of such facts, are we warranted in saying that appellant was making such use of this property 'as a prudent man would not do with his own property?' Can we say that it is such extravagant, humorous waste that a court of equity ought, pro bono publico, to moderate it? To such contention we cannot assent. Prudent men mine their lands, and sell the minerals and ores. They sell the right to others, and they lease them upon royalties, and we cannot say it constitutes equitable waste."

Other authorities to the effect that the holder of a determinable fee before its determination has all the rights of a fee simple title holder, and that the holder of a mere possible estate in reversion has not sufficient right or interest in the property to authorize him to maintain an action for waste, are 16 Cyc. 603-4 and 661; 10 R. C. L. 653; Mitchell v. R. R. Co., 111 Ga. 760; McGovern v. Hern, 10 L. R. A. 815; Dees v. Chevronts (Ill.), 88 N. E. 1011.

The property in this case has been used for school purposes now for thirty years or more, and there is nothing in the pleadings or evidence to suggest any purpose on the part of the school authorities to abandon its use for such purpose, and consequently there is nothing to indicate that the title conveyed to the school trustees will at any time in the near future be determined by the cessation of the use of the property for such purposes.

Appellee, however, relies upon a certain class of cases holding that where property has been conveyed for school purposes and a reversionary clause is inserted, its use for other purposes works a forfeiture of the original grant, and the reversion takes place. But that class of cases has no application here whatsoever for the very plain and sufficient reason that the property here is not being used for other than school purposes, or in any such way as to interfere with the efficient and orderly administration of the school. There is no allegation that the oil development has or will interfere with the school; and even if there was appellee, who is not now a resident of the school district, is not in position to make that question.

But it is earnestly argued that the county board of education being the creature of the statute for a specific purpose, its only duty and authority lies in the administration of educational affairs; that it is not authorized to go into the field of speculation and engage in hazardous industrial affairs, even though such activities might result profitably, and for that reason alone the oil lease given by the school board was invalid and properly cancelled. In the first place, the mere leasing of its property to others for development purposes is not engaging in a commercial venture, but is, properly speaking, only an effort to get from its property the real values therefrom, to the end that there may be a more efficient administration of school affairs.

In support of this argument reliance is had upon the case of Herald v. Board of Education, 65 W. Va. 765; 31. L. R. A. (N. S.) 588. In that case it was held by a majority of the Supreme Court of West Virginia that a school board under the statute of that state had no power to lease a schoolhouse lot for oil and gas purposes, even though the school authorities had the absolute title thereto.

Under the provisions of section 4437, Kentucky Statutes, 1915 edition, which was in effect at the time the deed was made from appellee to the school board, such school trustees were authorized to

"take, hold and dispose of real and personal estate for the maintenance, use and benefit of the common schools of their district."

It would appear to need no argument to show that if such trustees had the right to hold and dispose of real estate they were authorized in the interest of education to execute a lease upon such school property as they had title to, and notwithstanding the majority opinion in the West Virginia case, we are unwilling to subscribe to the doctrine that although the school authorities in this Commonwealth may have absolute title to land which is underlaid with valuable minerals, they may not for educational purposes enter into contracts with others to develop such minerals upon equitable terms for the benefit of the schools.

Oil and gas are fugitive minerals; they are connected by underground streams or crevices by which they may be drained from one property on to another, and there brought to the surface. There can be no sound or practical reason given that will deprive school authorities who own property, under which there are valuable minerals, from entering into contracts for its development, and particularly would this seem to be true where the character of the mineral is such that adjoining landowners may profit at the expense of the school property by the failure of the school authorities to enter into such contracts. It is shown in this record that there are on adjoining lands other producing oil wells very near to the property lines of the school lot, and it is perfectly apparent that if the well on the school lot had not been drilled the oil on the school lot would soon have been drained from it by such wells, and the school authorities would have thereby been deprived of the chief wealth on the property to which they had title for the benefit of the school. There was, how-

ever, in the West Virginia case referred to, a strong dissenting opinion in which we fully concur. That opinion, after discussing the West Virginia statute, said:

"I think the statute not only expressly, but impliedly, gives this board ample power to lease this property. This ought especially to be so where the product, as in this case, is oil and gas, fugitive in nature, and which will be drained and carried away by operations on adjoining lands."

We are of opinion, therefore, that under the statute in existence at the time the title was conveyed to the school authorities the board of education had the right to execute the lease in question, and having the right to do so it was its duty to do so to prevent the valuable mineral product on the school property from being appropriated by others.

The views which we have here expressed make it unnecessary to discuss the other questions presented.

The judgment is reversed with directions to set aside the judgment entered, to dismiss the plaintiff's petition, and on the counterclaim and cross-petition to quiet the present title of the school board and to enjoin appellee from further claiming any present right or interest in the school lot.

Whole court sitting.