# CHARLESTON.

ANDERSON H. BROWN *et als.* v. THE BOARD OF EDUCATION OF CHARLESTON INDEPENDENT SCHOOL DISTRICT

(No. 6294)

Submitted November 13, 1928.    Decided December 4, 1928.

*T. G. Nutter* and *C. E. Kimbrough, Sr.,* for plaintiffs in error.

*Price, Smith & Spilman, Geo. E. Price* and *Robert S. Spilman,* for defendant in error.

LITZ, JUDGE:

This is a writ of error to the judgment of the circuit court quashing an alternative writ of mandamus which commands the respondents, J. E. Robins, W. L. Price, Val Fruth, Sallie Spencer, R. S. Spilman, W. H. Belsches, Ruth Rummel and Wilbur Stump, as members of The Board of Education of The Charleston Independent School District to show cause why they shall not permit the petitioners, Anderson H. Brown, E. L. Powell and William W. Sanders (negro citizens and tax-payers of said school district), and all other colored residents therein to enter and use the Charleston Public Library in the city of Charleston at the former Capitol Annex Building, subject to proper rules and regulations.

Article 12, section 8, of the West Virginia Constitution proclaims that white and colored persons shall not be taught in the same schools. Chapter 45, section 67, Code, also declares that white and colored pupils shall not be taught in the same school or in the same building.

Section 6, Chapter 74, Acts 1911, provides that the Board of Education of Charleston Independent School District "may annually levy a tax not to exceed two cents on the hundred dollars' valuation, for the establishment, support, maintenance, and increase of a public library, which shall be under the control of the said board of education." This section was re-enacted and amended as section 6, Chapter 73, Acts 1917, by increasing the levy from two to three cents. It was again re-enacted and amended as section 6, Chapter 99, Acts 1923, as follows: "Said board of education is authorized to establish, support and maintain in said district a public library and branches thereof; to purchase, acquire by condemnation in the manner provided in chapter forty-two of the code of West Virginia or otherwise acquire such real estate as may be necessary or proper in connection therewith; and to construct, purchase, lease or otherwise acquire one or more library buildings, and to furnish, equip and maintain the

same. For the purposes aforesaid it may levy annually for the years one-thousand nine hundred and twenty-three, one thousand nine hundred and twenty-four, one thousand nine hundred and twenty-five, and one thousand nine hundred and twenty-six a tax not to exceed five cents for each one hundred dollars' valuation of property, and for the year one thousand nine hundred and twenty-seven, and each year thereafter, it may levy a tax not to exceed three cents for each one hundred dollars' valuation of property for the support, maintenance and enlargement of said library building or buildings. And said board of education is further authorized to accept, receive, and use gifts, devises and bequests for any or all of the purposes aforesaid.'' The statute was again re-enacted and amended as section 6, chapter 123, Acts 1927, by increasing the rate of levy for 1927 and 1928 from three to five cents.

With the levies collected under the several special acts and other large sums of money privately contributed for the establishment and maintenance of a public library in the city of Charleston, the Capitol Annex Building has been purchased and equipped as a public library.

At a meeting of the Board of Education December 9, 1926, the following resolution was adopted: ''Whereas, this Board by resolutions of June 5, 1923, has declared that the Colored Library be kept separate from the library of the white people of the city in the same manner and to the same extent that the colored schools are kept separate; and, whereas, by resolution of October 12, 1926, the library committee of this Board was authorized to move the books and get in order the colored branch library in Shrewsbury Street; and, whereas, by resolution of November 9, 1926, the library commission was authorized and requested to open and provide suitable equipment for said colored library in Shrewsbury Street. Be it resolved that this Board re-affirm the previous resolutions as adopted by them and proceed to open a library in Shrewsbury Street for the exclusive use of colored people of the city, to be known as the colored branch library and to appoint a committee of seven colored citizens of the city to serve until the end of the fiscal year as a library board and for the operation

and governing of said library after the manner in which the library in the Capitol Annex Building, which is for the exclusive use of the white people of the city, is now operated and governed.''

At another meeting of the Board of Education February 21, 1928, it was resolved: ''That The Charleston Public Library located in the Capitol Annex Building be, and it is hereby declared to be and made part of the public school system of this district for the use of white school children and white citizens only; and that the Garnett Branch Library now located in Shrewsbury Street but which is to be transferred to and maintained in quarters provided for it in the new Garnett High School building, plans for which the Board has adopted and the erection of which it is about to commence, be and it is hereby declared to be and made a part of the public school system of this district for the use of colored children and colored citizens only.''

The circuit court in its ruling adopted the contention of the respondents that The Charleston Public Library established and maintained in the Capitol Annex Building is a part of the public school system of The Charleston Independent School District, and as such may be limited in its use to ''white school children and white citizens.'' In view of section 62, Chapter 45 of the Code, providing for the establishment and maintenance of school libraries by the Boards of Education of every district and independent district, it cannot be said that the Legislature intended to establish a school library in the passage of the several special acts providing for the establishment and maintenance of a public library. The mere designation of a Board of Education as the agency to establish, maintain and control a public library does not convert it into a school library or make it a part of the public school system. As an illustration, a ministerial act does not become a judicial act when performed by a judicial officer.

A public library is a library to which the general public has free access. 32 Cyc., 1248. It is said, however, that the maintenance of a public library for the joint use of white and colored citizens would be inconsistent with the public policy of the state, established by its laws, institutions, cus-

toms, practices and traditions, of separating the races; and that in keeping with this policy, the legislative acts, under consideration, should be construed so as to uphold the action of the board in denying to negroes the use of the Charleston Public Library. In other words, it is contended that the Legislature meant to provide for the establishment of a school library, which should be under the control of the board of education as a part of the public school system, and not a public library as the statutes declare. This argument is answered by chapter 64, Acts 1915, authorizing any municipality to establish a public library on approval of a majority vote of its citizens by levying a tax of not more than one and one-half cents on each one hundred dollars' valuation of the taxable property therein. Section 5 of the Act declares that each library established thereunder ''shall be free for the use of the inhabitants of the municipality where located, subject to such reasonable rules and regulations as the library board may adopt and publish, in order to render the use of said library of greatest benefit to the greatest number;'' and authorizes the library board to exclude from the use of said library any and all persons who shall wilfully violate such rules. The fact that this statute has not been adopted by the citizens of Charleston has no bearing upon the legislative intent shown in the enactment of a general law authorizing the establishment and maintenance of public libraries which ''shall be free for the use of the inhabitants of the municipality where located, subject (only) to such reasonable rules and regulations as the library board may adopt and publish, in order to render the use of said library of greatest benefit to the greatest number.'' But we would not be justified, on account of public policy, in construing a plain statute to mean something other than its language imports. Section 81, chapter 51, Acts 1925, provides that ''it shall be the duty of the board of education in any district which does not maintain a high school, or assist in the maintenance of the county high school, to pay the tuition fees of all pupils in its district who have completed the course of study in the elementary school and who attend public high schools in other districts or counties, *or other schools of high school grade within the*

*state.''* Applying this statute, it was held in *Gissy* v. *Board of Education*, 105 W. Va. 429, 143 S. E. 111, that the board of education in a district which did not maintain a high school or assist in the maintenance of the county high school, should pay the tuition fees of pupils in its district (who had completed the course of study in the elementary schools) while attending a parochial high school in another district. The board of education in resisting payment of the fees in question contended that because of the policy of the state to foster public school education, the statute should not be so construed as to encourage the establishment of church schools whose pupils are eligible for public school training. Responding to this contention, JUDGE LIVELY, who wrote the opinion of the Court, said:

> ''It was further suggested in argument and conference that to allow pupils to attend 'other schools of high school grade,' when a public high school was equally available, would bring about undue activity and solicitation from denomination schools of such grade for the enlistment of such pupils in their schools, to the detriment of the free schools, and we should interpolate into the plain words of the statute the choice of dictation by the board paying the tuition as to whether the pupil should attend a public high school or other school of like grade, in order to prevent that suggested imaginary evil. It may be observed that the tuition fees are limited in the Code of 1923 to $5 per month for each pupil, with a minimum of $2.50. Whether this sum would induce hurtful activity and competitive solicitations from the various denominational schools is rather a vague assumption. But, whether that result may ensue or not, the courts have nothing to do with the wisdom of legislative acts. The Legislature has unlimited power, except where it is not restricted by the Constitution of the state or United States.
>
> Even if the courts are convinced that some particular act is unwise or vicious, they will not declare the act invalid, if not in conflict with the paramount law of the land. To do so would be usurpation of legislative powers, and violate the fundamental division of our government into leg-

islative, judicial, and executive branches. *State v. Peel Splint Coal Co.*, 36 W. Va. 802, 15 S. E. 1000, 17 L. R. A. 385; *State v. Workman*, 35. W. Va. 367, 14 S. E. 9, 14 L. R. A. 600; *Slack v. Jacob*, 8 W. Va. 612; *Osburn v. Staley*, 5 W. Va. 85, 13 Am. Rep. 640.''

It is sought to justify the action of the Board of Education also on the ground that the governing body of the public library may in the exercise of the police power of the state limit its use to ''white school children and white citizens.'' The principle relied on has been applied by the courts in approving rules and regulations by railroad companies providing separate coaches for white and colored passengers.

Granting that the Board of Education may provide separate departments for white and colored persons in the library building, we do not think it is vested with such regulatory powers either under the statute or under the police power of the state as would justify it in excluding colored persons therefrom.

The petition, in our opinion, states a case for relief. The ruling of the circuit court is therefore reversed and the case remanded.

*Reversed and remanded.*

MAXWELL, JUDGE, (concurring on petition for rehearing):

It is asserted on behalf of respondents: ''If the library is a part of the school system, then clearly the board was bound to make such a separation. If it is not a part of the school system, then the board has the power to make such a separation as police regulation under all the authorities.''

The legislative acts referred to in the opinion by JUDGE LITZ authorize the establishing and maintaining of a public library in Charleston Independent School District. There is nothing in any one of the four acts to indicate that the proposed library was to be a school library merely. The phrase ''public library'' has a definite and well understood meaning and is not susceptible of construction or interpretation. It means just what it says—neither more nor less. *People ex rel. etc.*

v. *Tax Commissioners,* (N. Y.), 11 Hun. 505. The fact that the legislature has seen fit to place this library under the control and supervision of the school board does not make of it a school library. Presumably this plan was adopted because at the times of the several enactments aforesaid, the school board was an existing, efficient and proper instrumentality to be entrusted with the responsibilities attendant upon the establishing and maintaining of a public library. The situation is no different than if a special board had been created for the purpose, or than if the legislature had seen fit to place these responsibilities upon the county court or the city council. The legislature thus not having authorized the establishment of this institution as a school library, the resolution of the board of education of February 21, 1928, declaring the said library to be a part of the public school system for the use of white school children and white citizens only, was without legal justification. Of course, if this library were in fact and in law a part of the public school system, segregation of the races would be warranted and lawful as a school matter. Constitution of West Virginia, Article 12, section 8; Code, Chapter 45, section 67. It is to be noted that in prior resolutions of the board bearing upon the segregation of the races in the use of the library, no intimation is made that it is a school proposition. So far as appears from the records before us this idea first chrystalized in the above mentioned resolution of February, 1928, and this was after the right of the board to enforce segregation as first attempted by it had been challenged.

Now as to the other proposition, namely, whether, it being considered that the library is not a part of the school system, the board has the power as a police regulation to declare the library in the Capitol Annex to be for the use of white people only. It cannot be seriously questioned that by constitutional provision or legislative enactment segregation of the races may be legally provided for in certain circumstances, notably in the matter of schools and public transportation; perhaps also in the use of libraries and other public institutions. ''The object of the amendment (14th amendment of the Constitution of the United States) was undoubtedly to enforce the abso-

lute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions placed upon color, or to enforce social, as distinguished from political equality, or a co-mingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and has been generally, if not universally, recognized as within the competency of the State Legislatures in the exercise of their police power.'' *Plessy* v. *Ferguson,* 163 U. S. 537, 544. Federal and state courts alike uphold this principle. Further citation of authorities is not necessary. The Supreme Court of the United States has also declared it to be the law that by reasonable regulations interstate public carriers may separate white and colored passengers. *Chiles* v. *C. & O. Ry. Co.,* 218 U. S. 71. In the opinion in that case the court said: ''Regulations which are induced by the general sentiment of the community for whom they are made and upon whom they operate, cannot be said to be unreasonable.'' Such regulations, it will be noted, are incident to interstate commerce and are not based on the police power of the state. There may also be segregation by contract. *Corrigan* v. *Buckley,* 299 Fed. 899. But that is not the proposition here.

Can the attempted segregation, bearing on a matter as to which the Constitution is silent and as to which the Legislature has not spoken, be made by a subordinate governmental agency? We are cited no cases, nor does a diligent search reveal any, upon which an affirmative answer might be predicated. The cases are the other way. Boards of education and other subordinate governmental agencies are limited in their authority by the constitutional provisions or the legislative enactments which give them birth.

''School districts are public *quasi* municipal corporations, sometimes termed 'involuntary corporations'. They have perpetual succession, and may sue or be sued even in the absence of a statute authorizing such action. They may make contracts, levy taxes, and possess property. They are organized not for the purpose of profit or gain, but solely for the public

benefit, and have only such limited powers as may be necessary for that purpose. They have therefore been said to be corporations of the most limited power known to the law. They are but the agents of the state for the sole purpose of administering the state system of public education, and have only such powers as are conferred expressly or by necessary implication." 24 R. C. L. p. 564. "School boards have no powers excepting those expressly granted, and those necessarily implied from those that are granted." *Crawford* v. *School Board*, (Ore.) 137 Pac. 217. That principle has been frequently recognized and applied by this Court. *Herald* v. *Board of Education*, 65 W. Va. 765, and cases cited. In the *Herald* case this Court quoted with approval from 3 Abbott Municipal Corporations, section 1080, as follows: "In common with the grant of powers to all subordinate and public *quasi* corporations, the rule of law applies of strict construction and a consequent limitation of the rights which may be exercised by them and the duties which they can legally perform." In the *Oregon* case, *supra*, it is held that in the absence of authority expressly granted by legislative enactment or necessarily implied, a school board has no authority to establish separate schools for the different races. On the limitations of subordinate tribunals see the following: *Kuhn ex rel. etc.* v. *Board*, (Mich.) 141 N. W. 574; *Maddox* v. *Neal*, 45 Ark. 121; *Baxter* v. *Davis*, (Ore.) 112 Pac. 410; *Clark* v. *Board*, 24 Iowa 266; *Pasadena Sc'l. Dis't.* v. *City of Pasadena*, (Cal.) 134 Pac. 985; *Knox* v. *Board*, (Kan.) 25 Pac. 616; *Chase* v. *Stephenson*, 71 Ill. 383; *Reynolds* v. *Board*, (Kan.) 72 Pac. 274; *Board* v. *Tinnon*, 26 Kan. 1; *People* v. *Board*, (Ill.) 40 Am. Rep. 196.

In the *Maddox* case, cited, the court said: "No discrimination on account of nationality, caste or other distinction has been attempted by the law making powers. The boards of directors are only the agents, the trustees appointed to carry out the system provided for. Their powers are no greater than the authority conferred by legislation. They can do nothing they are not expressly authorized to do or which does not grow out of their express powers." In the *Pasadena* case, *supra*, we find: "School districts are *quasi*

486

municipal corporations of the most limited power known to the law. Their trustees have special powers, and cannot exceed the limit.''

Unless a subordinate governmental agency has authority therefor in the breadth of its legislative grant of power, necessarily incident thereto, as in *Roberts* v. *Boston,* (Mass.) 5 Cushing 196, and *Hopkins* v. *Richmond,* (Va.) 86 S. E. 139, or is specifically clothed with such authority, it may not enforce a segregation of the races in the enjoyment of public institutions. Cases *supra.* The police power is an attribute of sovereignty which rests in the states, and has not been surrenderd by them to the federal government. 12 Corpus Juris, 907; 6 R. C. L. 191. It is to be exercised by the Legislature or by subordinate governmental agencies acting only under legislative authority expressly delegated or necessarily implied. As illustrative of this proposition see *Judy* v. *Lashley,* 50 W. Va. 628, wherein it is stated: ''The police power of a municipal corporation depends upon the will of the legislature, and a city, town or village can only exercise such police power as is fairly included in the grant of powers by its charter.'' Authorities need not be multiplied. On reason, this principle applies to all agencies of government acting under legislative authority.

In the management of the public library authorized by the legislative acts aforesaid the Board of Education does not have the authority under the police power of the state, by reason of either general or special authorization, to exclude colored citizens therefrom. This is a legislative matter.

It thus follows that the action of the Board cannot be legally justified either on the theory that the library is a part of the public school system or on the basis of the police power of the state.