IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

FILED

October 10, 2017

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 17-0767

WEST VIRGINIA BOARD OF EDUCATION and
STEVEN L. PAINE, Ed.D., in his capacity as the
State Superintendent of Schools,
Respondents Below, Petitioners

v.

BOARD OF EDUCATION
OF THE COUNTY OF NICHOLAS, WEST VIRGINIA,
Petitioner Below, Respondent

Appeal from the Circuit Court of Kanawha County
The Honorable Louis H. Bloom, Judge
Civil Action No. 17-P-232

REVERSED

Submitted:  October 3, 2017
Filed:  October 10, 2017

Patrick Morrisey, Esq.
Attorney General
Kelli D. Talbott, Esq.
Senior Deputy Attorney General
Charleston, West Virginia
Attorneys for Petitioners

Kenneth E. Webb, Jr., Esq.
Rebecca M. Tinder, Esq.
Bowles Rice, LLP
Charleston, West Virginia
Attorneys for Respondent

Robert M. Bastress, Esq.
Morgantown, West Virginia
*and*
Jeffrey G. Blaydes, Esq.
Carbone & Blaydes, P.L.L.C.
Charleston, West Virginia
Attorneys for Amici Curiae
Richwood High School Alumni
Association, American Federation of
Teachers-West Virginia, Sharon
Glasscock, Michael Fox, and Jocelyn
Swearingen

R. Booth Goodwin II, Esq.
W. Jeffrey Vollmer, Esq.
Goodwin & Goodwin, LLP
Charleston, West Virginia
Attorneys for Amicus Curiae
West Virginia School Board
Association

JUSTICE WORKMAN delivered the Opinion of the Court.
CHIEF JUSTICE LOUGHRY concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1.      "A *de novo* standard of review applies to a circuit court's decision to grant or deny a writ of mandamus."  Syl. Pt. 1, *Harrison Cty. Comm'n v. Harrison Cty. Assessor*, 222 W.Va. 25, 658 S.E.2d 555 (2008).

2.      "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to de novo review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W.Va. 573, 466 S.E.2d 424 (1995).

3.      "To invoke mandamus the relator must show (1) a clear right to the relief sought; (2) a legal duty on the part of the respondent to do the thing relator seeks; and (3) the absence of another adequate remedy."  Syl. Pt. 2, *Myers v. Barte*, 167 W.Va. 194, 279 S.E.2d 406 (1981).

4.      "Mandamus does not lie to control a board of education in the exercise of its discretion, in the absence of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of law upon the part of such board." Syl. Pt. 1, *State ex rel. Payne v. Bd. of Educ. of Jefferson Cty.*, 135 W.Va. 349, 63 S.E.2d 579 (1950).

5.      "The West Virginia Board of Education and the State Superintendent of Schools, pursuant to their general supervisory powers over education in West Virginia

under *W.Va. Const.* art. XII, § 2, and their specific duties to establish, implement and enforce high quality educational standards for all facets of education under the provisions of Chapter 18 of the West Virginia Code, have a duty to ensure the complete executive delivery and maintenance of a 'thorough and efficient system of free schools' in West Virginia[.]" Syl. Pt. 1, in part, *Pauley v. Bailey*, 174 W. Va. 167, 324 S.E.2d 128 (1984).

6.      "Rule-making by the State Board of Education is within the meaning of 'general supervision' of state schools pursuant to art. XII, § 2 of the West Virginia Constitution, and any statutory provision that interferes with such rule-making is unconstitutional." Syl. Pt. 2, in part, *W. Va. Bd. of Educ. v. Hechler*, 180 W. Va. 451, 376 S.E.2d 839 (1988).

7.      The West Virginia Board of Education is entitled to utilize its discretion in approving or rejecting an amendment to a Comprehensive Educational Facilities Plan submitted pursuant to West Virginia Code of State Regulations §§ 126-176-1 *et seq.* (2005) in aid of school closure or consolidation.

WORKMAN, Justice:

This is an appeal from the August 18, 2017, order of the Circuit Court of Kanawha County, granting a writ of mandamus in favor of the Nicholas County Board of Education ("the Board"), requiring the West Virginia Board of Education and Dr. Steven L. Paine, in his capacity as State Superintendent of Schools (hereinafter collectively "the WVBOE"), to approve the Board's amended Consolidated Educational Facilities Plan ("CEFP"). The amendment to the CEFP constitutes a necessary prerequisite to the Board's efforts to consolidate four Nicholas County schools and its Career and Technical Education Center. The circuit court found that the WVBOE lacks the authority to reject a county board's CEFP and attendant consolidation plan if the county complies with the requirements of West Virginia Code § 18-5-13a (2002) and West Virginia Code of State Regulations §§ 126-176-1 *et seq.* (2005). The circuit court further found that the WVBOE members' stated reasons for rejecting the CEFP amendment and consolidation plan were "arbitrary and capricious" inasmuch as the reasons were not expressly contained in the WVBOE's promulgated rule regarding school consolidation and closure.

Upon careful review of the briefs,[1] the appendix record, the arguments of the parties, and the applicable legal authority, we conclude that the WVBOE is vested

---

[1] The Court wishes to acknowledge and express its appreciation for the contributions of the *amici curiae*. Briefs were submitted on behalf of Richwood High School Alumni Association, American Federation of Teachers-West Virginia, Sharon Glasscock, Michael Fox, and Jocelyn Swearingen in support of the WVBOE's position. (continued . . .)

1

with constitutional, statutory, and regulatory authority to exercise its discretion in accepting or rejecting an amended CEFP and attendant consolidation plan and that mere procedural compliance with statutory and regulatory requirements does not entitle a county board of education to approval of its proposed plan. We further find that the reasons formally adopted by the WVBOE for rejection of the plan were neither arbitrary nor capricious. Therefore, the circuit court erred in granting the writ of mandamus.

## I. FACTS AND PROCEDURAL HISTORY

On June 23, 2016, Richwood Middle School, Richwood High School, and Summersville Middle School were seriously damaged by flood waters. As a result of the flooding, the President of the United States issued a natural disaster declaration, making the schools eligible for Federal Emergency Management Agency ("FEMA") funds. Following the flood, the Board discovered that FEMA funds could not be used to rebuild Richwood Middle School or Richwood High School in their existing locations because they are located in the floodplain. These schools are therefore eligible for "directed relocation funds" used for rebuilding outside of the floodplain. The Board was further advised that FEMA "428" funds were available, which would enable it to consolidate all of the pending FEMA funds and utilize them for projects other than "one-for-one"

Briefs were likewise submitted on behalf of the West Virginia School Board Association in support of the Board's position.

2

replacement.[2]  It is these "428" funds it seeks to use to build the proposed comprehensive consolidated campus at issue.

Nicholas County School Board Superintendent Donna Burge-Tetrick purportedly considered numerous alternative site locations for Richwood Middle School and Richwood High School, none of which she found suitable.  After purportedly exploring these alternative locations, Ms. Burge-Tetrick recommended to the Board that it consolidate Richwood Middle and Summersville Middle Schools and Nicholas County and Richwood High Schools, along with the Career and Technical Education Facility, to be located together on a consolidated campus.

---

[2] The so-called "428" program pertains to a recent amendment to the Robert T. Stafford Disaster Relief and Emergency Assistance Act:

> On January 29, 2013, President Obama signed into law the Sandy Recovery Improvement Act of 2013.  This law amends Title IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).  Specifically, the law adds section 428, which authorizes alternative procedures for the Public Assistance (PA) program under sections 403(a)(3)(A), 406, 407 and 502(a)(5) of the Stafford Act.

https://www.fema.gov/alternative-procedures (last visited October 10, 2017).

The deadline for application for these "428" funds was on or about June 26, 2017; FEMA granted a six-month extension.  Only FEMA "428" funds are subject to this deadline; traditional "one-for-one" replacement funds apparently have no such deadline. In light of this deadline and to enable the Board to utilize the 428 funds should circumstances warrant, this Court has acted in an expedited manner throughout to resolve the issues presented.

3

In furtherance of this plan, the Board prepared a written closure and consolidation plan pursuant to West Virginia Code § 18-5-13a and West Virginia Code of State Regulations § 126-176-1 *et seq.*, commonly and hereinafter referred to as "Policy 6204." The statute and regulations, in part, require a county board to collect data and information to be incorporated into a written consolidation plan. Policy 6204 requires the written consolidation plan to include an executive summary containing information and data, as more particularly described therein, pertaining to the following categories: enrollment, facilities, finance, personnel, transportation, and education programs.[3]

As further required by the statute and Policy 6204, five public hearings were held between February 24 and March 6, 2017, at the affected schools where members of the public spoke both for and against consolidation. After the required hearings, the Board voted unanimously to move forward with consolidation. Pursuant to Policy 6204, the next step was to request amendment of its CEFP from the WVBOE.

---

[3] Ms. Burge-Tetrick expressed during the various meetings and public hearings that consolidation was justified in varying degrees by some of the following considerations: declining population in Nicholas County, an approximate $350,000.00 savings (primarily in personnel and utilities), lesser duplication of services (*i.e.* the need to staff low-enrollment classes in both schools), little appreciable increase in transportation times, and increased classroom time for career and tech students who would no longer have to travel to the Career and Technical Education Center.

The Board's proposed amended CEFP was placed on the WVBOE's June 13, 2017, meeting agenda.[4] During the meeting, Ms. Burge-Tetrick made a presentation on the merits of the consolidation plan. Additional information was presented by State Superintendent Dr. Steven Paine and Scott Raines, the Director of School Planning from the School Building Authority.[5] Other interested parties spoke in favor of and against the amendment.[6] Members of the WVBOE questioned the various speakers regarding a multitude of issues bearing on the propriety of consolidation.

During his presentation, Dr. Paine stated that the Board had followed all of the necessary procedures to comply with Policy 6204. Dr. Paine further offered commentary regarding the consolidation, stating that the Board was the most financially solvent of all the county systems, with the greatest amount of carryover funds annually,

---

[4] After the Board voted in favor of consolidation but before the CEFP amendment could be considered by the WVBOE, a preliminary injunction seeking to enjoin the Board from pursuing consolidation was sought in the Circuit Court of Nicholas County. The WVBOE held the Board's request for CEFP amendment in abeyance pending the outcome of that litigation. The injunction was denied in early June, after which the WVBOE proceeded to place the Board's CEFP amendment on the agenda for its June 13, 2017, meeting.

[5] Mr. Raines indicated that Frank Blackwell, Executive Director of the School Building Authority, asked him to develop an alternative plan; this plan involves consolidation of Richwood Middle and High Schools and a separate consolidation of Nicholas County High School and Summersville Middle School. The Board maintains that this option was considered and rejected as not being in the students' best interests.

[6] The appendix record reveals that an architectural expert had identified what he believed to be alternative, feasible properties near the old Richwood schools and prepared a model school.

5

and that the affected schools were performing well academically. He noted that the June 26, 2017, deadline for application for the FEMA "428" funds was subject to an extension, which he was assured would be granted. He further noted that if the "428" funds were not pursued, other traditional FEMA funds would still be available without such time constraints. Notably, Dr. Paine also noted that he believed that an alternative plan existed which had not been considered by the Board, *i.e.* consolidation of only the Richwood schools, to remain in the Richwood attendance area, and consolidation of the Summersville schools, to remain in the Summersville area.[7]

At the close of the meeting, WVBOE Vice President David Perry moved to reject the CEFP amendment due to his belief that "sufficient alternatives and possibilities have not been explored to be assured this plan is in the best interest of the students of Nicholas County, specifically of those in the current [Richwood schools] areas." The CEFP amendment was then rejected on a vote of 7-1.[8]

The Board thereafter filed the instant action seeking a writ of mandamus to compel the WVBOE to accept its proposed CEFP amendment, contending that the

---

[7] This suggestion was also made multiple times at the public hearings, but was met with comments by Ms. Burge-Tetrick indicating that such a configuration did not address certain issues that wholesale consolidation did.

[8] WVBOE member James Wilson was the recurrent vote against the motion to reject; he expressed merely that he was not close to the issues in Nicholas County and therefore would defer to its preferences.

6

WVBOE acted arbitrarily and capriciously in rejecting the amendment. The circuit court issued a rule to show cause, which was served upon the WVBOE along with the petition. The day before the rule to show cause hearing, the WVBOE convened an emergency meeting to reconsider the CEFP amendment. After presentations and speakers both for and against consolidation, Mr. Perry again moved to reject the amendment, stating that he had "different reasons" for rejection. Mr. Perry stated that 1) he felt there was a lack of "meaningful dialogue" between the Board and the Nicholas County citizens; 2) the Board did not consider alternatives to consolidation including locations in the Richwood attendance area, rather than simply the Richwood city limits; 3) there was equivalent declining population in Nicholas County High School area, rather than just the Richwood High area; 4) utilization of technology would net the same personnel cost savings; and 5) the Richwood schools were comparably educating students and out-performing other schools in the state on most metrics.[9] The WVBOE then again voted 6-1 to reject the amendment.

The following day, on July 11, 2017, an evidentiary hearing was held on the rule to show cause. Each WVBOE member who voted to reject the plan was questioned regarding the basis of his or her vote. WVBOE President Thomas Campbell testified that he voted to reject due to several reasons including lack of community

---

[9] Richwood High School was recognized in 2014 and 2016 by U.S. News and World Report as one of the best high schools in the State. It had a 96% graduation rate; Nicholas County High School had a 90% graduation rate for the 2015-16 school year. Both have extremely high "highly qualified" teacher rates.

7

outreach, poor communication, and financial considerations. He further expressed concern that consolidation of two high-performing schools would not necessarily translate into a singular high-performing school. President Campbell emphasized the WVBOE's obligation to assess impact on the system as whole. Vice President Perry testified consistent with the reasons articulated in his formal motion. Member Debra Sullivan testified that she did not believe the Board considered the views of the citizens, nor the impact of consolidation on extracurricular activities, and generally favored smaller community schools which typically enhance parent involvement. Member Frank Vitale testified he did not believe the Board did enough to solicit input from the community. Member Jeff Flanagan testified he did not believe the Board provided enough detail about potential sites or funding. Member Miller Hall testified he did not believe the Board considered the impact of consolidation on student discipline. Member Frank Rotruck testified he wanted the Board to consider other community school options. A recurrent concern throughout the testimony was the high number of impoverished students from the Richwood area and the research supporting the notion that such students perform better in smaller, community schools.[10]

The circuit court found that the WVBOE "did not follow its own rules and procedures set forth in Policy 6204" by rejecting the plan based on "factors" not

---

[10] Seventy percent of Richwood Middle School students and sixty-eight percent of Richwood High School students qualify for free or reduced lunch.

contained in Policy 6204. The circuit court found the WVBOE members' reasons for rejection "arbitrary" and matters which "the Legislature did not intend them to consider[.]" The circuit court further found that the WVBOE's rejection was "pre-textual and an abuse of power," relying on testimony regarding the Governor's stated preferences for a school in Richwood during his State of the State address.[11] The circuit court further found that the WVBOE's only role relative to consolidation is "to determine whether the county boards are following the requirements of" and/or "supervising compliance" with the statute. Expressing that the county is in a better position to determine its needs relative to consolidation, the circuit court found that the WVBOE "does not have unfettered discretion to simply substitute its judgment for that of a local county school board[.]"

The circuit court therefore awarded the writ of mandamus, ordering the WVBOE to approve the Board's CEFP amendment.[12] This appeal followed.

---

[11] The circuit court also referenced brief testimony to the effect that Vice President Perry told a friend he would vote against consolidation because "that's what the Governor wants" as well as President Campbell's testimony that he knew the Governor's "heart" was in community schools. There was no additional testimony or other evidence that the Governor was in any way involved in the WVBOE's deliberations.

[12] The WVBOE sought a stay of the order pending this appeal, but the circuit court refused unless the WVBOE posted a $130 million bond. Declining to post the bond, the WVBOE conditionally approved the CEFP pursuant to the circuit court's order, but moved this Court for a stay without bond. This Court granted the stay without bond, which the WVBOE construed as "invalidating" its conditional approval of the CEFP.

9

## II. STANDARD OF REVIEW

"A *de novo* standard of review applies to a circuit court's decision to grant or deny a writ of mandamus." Syl. Pt. 1, *Harrison Cty. Comm'n v. Harrison Cty. Assessor*, 222 W.Va. 25, 658 S.E.2d 555 (2008). Moreover, "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W.Va. 573, 466 S.E.2d 424 (1995).

Insofar as the underlying standard for the circuit court's grant of the writ, we have held: "To invoke mandamus the relator must show (1) a clear right to the relief sought; (2) a legal duty on the part of the respondent to do the thing relator seeks; and (3) the absence of another adequate remedy." Syl. Pt. 2, *Myers v. Barte*, 167 W.Va. 194, 279 S.E.2d 406 (1981). However, we are mindful that "[m]andamus does not lie to control a board of education in the exercise of its discretion, in the absence of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of law upon the part of such board." Syl. Pt. 1, *State ex rel. Payne v. Bd. of Educ. of Jefferson Cty.*, 135 W.Va. 349, 63 S.E.2d 579 (1950).[13] With these considerations in mind, we turn to the parties' arguments.

_____

[13] Mandamus, rather than administrative appeal, is the proper vehicle through which to challenge an adverse outcome regarding school closing or consolidation. *See State ex rel. W. Va. Bd. of Educ. v. Perry*, 189 W. Va. 662, 434 S.E.2d 22 (1993) (finding aggrieved parties to closure had no remedy under Administrative Procedures Act, W. Va. (continued . . .)

10

## III. DISCUSSION

The issue presented herein is whether the WVBOE has authority to reject a CEFP amendment attendant to a consolidation plan, where the local board has complied with the requirements contained in West Virginia Code § 18-5-13a and West Virginia Code of State Regulations §§ 126-176-1 *et seq.* If the Court determines that the WVBOE has such authority, it must ascertain whether such authority was exercised arbitrarily or capriciously in this case. We wish to make plain, however, as this Court has historically observed in cases of this nature, that the advisability, or lack thereof, of consolidation is not properly within this Court's purview. The wisdom, efficacy, and feasibility of school consolidation are matters reserved to the respective boards of education. *See City of Benwood v. Bd. of Educ., Cty. of Marshall*, 212 W.Va. 436, 442, 573 S.E.2d 347, 353 (2002) ("[W]e note that our focus in this case was not on the merits of consolidation or our beliefs as to whether or not consolidation is advisable for the schools of Marshall County[.]").[14] This Court's charge is solely to ascertain whether the WVBOE's rejection of the CEFP amendment was a proper use of its lawful authority.

---

Code § 29A-1-2(b)); *see also* Syl. Pt. 4, *Dillon v. Bd. of Educ. of Cty. Of Wyoming*, 177 W. Va. 145, 351 S.E.2d 58 (1986) ("Mandamus will lie to control a board of education in the exercise of its discretion upon a showing of caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of the law.").

[14] *See also Bd. of Educ. of Cty. of Kanawha v. W. Va. Bd. of Educ.,* 184 W.Va. 1, 5, 399 S.E.2d 31, 35 (1990) ("Indeed, the merits of neither the County Board's nor the State Board's decision are supposed to be in issue in this appeal.") (hereinafter "*Kanawha County Board*"); *State ex rel. Jones v. Bd. of Educ. of Ritchie Cty.*, 178 W.Va. 378, 380, (continued . . .)

11

*A.*     *Authority of WVBOE to Reject CEFP Amendment*

The circuit court found that the WVBOE has only such authority as is expressly granted by the Legislature and that neither the statute nor regulations at issue provide for the WVBOE's exercise of its discretion to reject a CEFP amendment and/or consolidation plan which is compliant therewith.   The WVBOE contends that it has both a constitutional grant of supervisory authority over such matters and that the particular statute and regulation at issue are further designed to make such matters subject to its approval.  We therefore begin our analysis by examining the circuit court's discussion of the relative powers and duties of the Legislature, the WVBOE, and local boards of education, inasmuch as it is this construct upon which the circuit court premised its ultimate conclusion in this matter.

1.     Constitutional Authority of the WVBOE

Article XII, section 2 of the *West Virginia Constitution* provides that "[t]he general supervision of the free schools of the State shall be vested in the West Virginia board of education which shall perform such duties as may be prescribed by law."   In reaching its conclusion that the WVBOE is constrained in the exercise of its authority relative to consolidation, the circuit court began with a threshold conclusion that Article XII, section 2's wording that the WVBOE "shall perform such duties *as may be prescribed by law*" serves to temper the WVBOE's constitutional charge.  (Emphasis

359 S.E.2d 606, 608 (1987) ("[W]e are not concerned with the wisdom of the Board's decision to reorganize the Ritchie County schools or with the merits of the plan itself.").

12

added). The circuit court found support for this limitation by comparing the Legislature's concomitant constitutional obligation to provide for a "thorough and efficient system of free schools" as contained in Article XII, section 1 of the West Virginia Constitution.[15] Concluding that such obligation empowers the Legislature to statutorily restrict the WVBOE's exercise of its powers, the circuit court stated that "the very text of the Constitution dictates that the State Board may only perform duties that are set forth in statute" and that the Constitution "limit[s] [the WVBOE's] supervision to that which the Legislature might set forth by statute."

With that backdrop, the circuit court then found that the Legislature has expressly delegated the decision to close or consolidate schools *exclusively* to local school boards and that the WVBOE's actions are an unauthorized attempt to interfere with such exclusivity. Citing West Virginia Code § 18-5-13(c) and (d), the circuit court found that these provisions clearly demonstrate the Legislature's intention that closure and consolidation matters remain at the local level because county boards "are better able to determine the specific needs of their individual counties[.]" *See* W. Va. Code § 18-5-13(c) and (d) (2017) ("[E]ach county board may . . . [c]lose any school . . . [w]hich is unnecessary . . . [and] [c]onsolidate schools[.]" The circuit court found that the local board "may make a final decision consolidating a school" and that the WVBOE's role is limited to reviewing or supervising the county board's efforts for the sole purpose of

---

[15] *See* W. Va. Const. art. XII, § 1 ("The legislature shall provide, by general law, for a thorough and efficient system of free schools.").

13

determining whether it is following the requirements set forth in West Virginia Code § 18-5-13a.

Before reaching the more precise issue presented herein, we are compelled by the foregoing to renounce the lower court's deeply misguided construction of the WVBOE's constitutional grant of authority inasmuch as it is wholly at odds with this Court's precedent. This Court has held that

> [t]he West Virginia Board of Education and the State Superintendent of Schools, pursuant to their general supervisory powers over education in West Virginia under *W.Va. Const.* art. XII, § 2, and their specific duties to establish, implement and enforce high quality educational standards for all facets of education under the provisions of Chapter 18 of the West Virginia Code, have a duty to ensure the complete executive delivery and maintenance of a "thorough and efficient system of free schools" in West Virginia[.]

Syl. Pt. 1, in part, *Pauley v. Bailey*, 174 W. Va. 167, 324 S.E.2d 128 (1984). More specifically, in *West Virginia Board of Education v. Hechler*, 180 W.Va. 451, 455, 376 S.E.2d 839, 842-43 (1988), this Court elaborated on the sanctity of the constitutionally-granted general supervisory authority of the WVBOE, explaining that

> "[g]eneral supervision" is not an axiomatic blend of words designed to fill the pages of our State *Constitution*, but it is a meaningful concept to the governance of schools and education in this state. Decisions that pertain to education must be faced by those who possess expertise in the educational area. These issues are critical to the progress of schools in this state, and, ultimately, the welfare of its citizens. In 1957, the citizens of this state conferred general supervisory powers over education and one need not look further than art. XII, § 2 of the State *Constitution* to see that

the "general supervision" of state schools is vested in the State Board of Education. Unlike most other administrative agencies which are constituents of the executive branch, the Board enjoys a special standing because such a constitutional provision exists.

(footnote omitted). Broadly stated, "[t]he State Board of Education, charged with the general supervision of our state's educational system, has a duty to ensure that the constitutionally mandated educational goals of quality and equality are achieved." *Bailey v. Truby*, 174 W.Va. 8, 16, 321 S.E.2d 302, 310 (1984).

As to the circuit court's belief that the "as may be prescribed by law" language of Article XII, section 2 renders the WVBOE powerless in absence of enabling legislation, this Court has unequivocally held that legislative action that impedes the general supervisory powers of the WVBOE is patently unconstitutional. In *Bailey*, the Court discussed the expansiveness of the "general supervision" power granted under the Constitution, examining at length the Kansas Supreme Court's analysis of the same issue as pertained to their similarly-worded Constitution. In *State ex rel. Miller v. Board of Education*, 511 P.2d 705 (Kan. 1973), the Kansas Supreme Court rejected an argument that the "as may be provided by law" language of its Constitution required enabling legislation to effectuate the general supervisory powers granted to its state board of education. The *Bailey* Court stated that it found this analysis persuasive, citing with approval the *Miller* court's holding that "'the legislature may enact legislation to *facilitate or assist* in [the state board's constitutional supervisory powers], but whatever legislation is adopted must be in harmony with and not in derogation of the provisions of

15

the constitution.'" *Id.* at 15-16, 321 S.E.2d at 310 (quoting *Miller*, 511 P.2d at 707, syl. pt. 7) (emphasis added). Accordingly, the *Bailey* Court likewise concluded that "constitutional grants of authority . . . cannot be derogated or eliminated by legislative or executive action. Therefore, any statutory provision that interferes with the State Board of Education's 'general supervision of the free schools of the State' . . . is void." *Id.* at 18, 321 S.E.2d at 312. *See also Powers v. State*, 318 P.3d 300, 308 (Wyo. 2014) ("The majority of courts that have addressed similar language in their constitutions have concluded that the phrase 'as prescribed by law' does not permit the legislature to abolish or transfer, either directly or indirectly, the inherent powers of a constitutionally created office.").

Similarly, this Court has further found that the WVBOE's general supervisory powers necessarily require rule-making to govern the day-to-day operation of schools and that the Legislature's charge to provide a thorough and efficient system of free schools "does not entail the exclusive delegation of rule-making functions that are part of the Board's general supervisory powers[.]" *Hechler*, 180 W. Va. at 455, 376 S.E.2d at 844. The *Hechler* Court noted that the WVBOE is statutorily recognized as having the authority to "make rules for carrying into effect the laws and policies of the State relating to education," as contained in West Virginia Code § 18-2-5 and that such rule-making power was found to be "a provision that has *aided* the Board's general

16

supervisory functions." [16] *Id.* at 454-55, 455, 376 S.E.2d at 841, 843 (emphasis added). The *Hechler* Court therefore found that any "attempt to impede" the WVBOE's supervisory power constitutes a violation of the separation of powers provision of the West Virginia Constitution.[17] *Id.* at 454, 456, 376 S.E.2d at 842-43. Accordingly, we held, in part, in syllabus point two that "[r]ule-making by the State Board of Education is within the meaning of 'general supervision' of state schools pursuant to art. XII, § 2 of the *West Virginia Constitution*, and any statutory provision that interferes with such rule-making is unconstitutional[.]" *Id. See also Detch v. Bd. of Educ. of Cty. Of Greenbrier*, 145 W.Va. 722, 728-29, 117 S.E.2d 138, 142 (1960) (noting that Legislature's obligation to provide thorough and efficient system is effectuated through statutory rule-making provision).

Furthermore, the circuit court's conclusion that the Legislature has effectively subordinated the WVBOE's supervisory powers to the edict of the local board where consolidation is concerned fully disregards this Court's admonition that "[i]n contrast to th[e] expansive interpretation of the power and authority of the State Board of

---

[16] The WVBOE's rule-making authority is now worded as follows: "Subject to and in conformity with the Constitution and laws of this state, the State Board of Education shall exercise general supervision of the public schools of the state, and shall promulgate rules . . . for carrying into effect the laws and policies of the state relating to education. . . ." W. Va. Code § 18-2-5(a) (2015).

[17] Article V, section 1 of the *West Virginia Constitution* states, in part: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]"

Education, this Court has traditionally construed the power and authority of the county boards of education in a very narrow fashion." *Bailey*, 174 W.Va. at 14, 321 S.E.2d at 309. More importantly, the circuit court's conclusion ignores this Court's prior rejection of an identical claim that a statutory delegation of authority to a local board operates to neutralize any attempt by the WVBOE to weigh in on and promulgate rules relative to the "delegated" matter.

In *Bailey*, in addition to discussing the self-executing effect of the WVBOE's constitutional supervision powers, the Court more specifically addressed the propriety of a rule promulgated by the WVBOE requiring a 2.0 grade point average to participate in extracurricular activities. The Kanawha County Board of Education argued that West Virginia Code § 18-2-25, providing that county boards "shall exercise the control, supervision and regulation of all interscholastic events and other extracurricular activities . . ." rendered the WVBOE rule an "invalid interference with their own exclusive right to control, supervise, and regulate extracurricular activities[.]" *Id.* at 13-14, 321 S.E.2d at 308. Rejecting this claim of exclusivity, the *Bailey* Court observed generally that "'"[s]chool districts . . . [have] been said to be corporations of the most limited power known to the law."'" *Bailey*, 174 W.Va. at 15, 321 S.E.2d at 309 (quoting *Brown v. Bd. of Educ.*, 106 W.Va. 476, 485, 146 S.E. 389, 392 (1929) (Maxwell, J., concurring on rehearing)). The Court reasoned that

> [t]he Legislature, in enacting West Virginia Code § 18-2-25 (1984 Replacement Vol.), could not have ignored the pervasive supervisory authority of the State Board of

18

> Education over county boards of education. Therefore, it is unlikely that it intended to vest the exclusive control, supervision, and regulation of extracurricular activities with county boards of education. Instead, it is more likely that, as with other county board of education activities, the legislative grant of authority found in West Virginia Code § 18-2-25 (1984 Replacement Vol.) was made *implicitly subject* to the general supervisory authority of the State Board of Education.

*Id.* at 18, 321 S.E.2d at 312 (emphasis added).

To whatever extent the foregoing does not clearly reflect this Court's veneration of the extensive sweep of the WVBOE's constitutional supervisory authority, we have succinctly stated: "Clearly, then, the State Board is empowered to take *whatever steps are necessary* to fulfill its obligation to achieve 'the constitutionally mandated educational goals of quality and equality[.]'" *Kanawha County Board*, 184 W.Va. at 5, 399 S.E.2d at 35 (1990) (quoting *Bailey*, 174 W.Va. at 16, 321 S.E.2d at 310) (emphasis added).

2.    Statutory Authority of WVBOE Relative to Consolidation

Having concluded that the WVBOE's constitutional supervisory powers are both broad and impervious to legislative impairment, we turn now to the more specific issue of whether the school consolidation statute implicated herein attempts to restrict the WVBOE's general supervisory powers or otherwise speaks to any limitations on the WVBOE's role regarding consolidation and/or consideration of a CEFP amendment. As indicated above, the circuit court found, and the Board argues, that the WVBOE is obligated to accept a CEFP amendment which is administratively "in compliance" with

19

West Virginia Code § 18-5-13a and the promulgated regulations known as "Policy 6204." It is undisputed in this case that the Board complied fully with the requirements contained in the statute and Policy 6204 prior to seeking the WVBOE's approval of its CEFP amendment and attendant consolidation plan.

School closings and consolidations are governed by West Virginia Code § 18-5-13a. Subsection (a) of that statute states that "prior to any final decision of a county board on any proposal to close or consolidate any school," it must perform certain tasks, in pertinent part as follows:

> (1) Prepare and reduce to writing its *reasons and supporting data regarding the school closing or consolidation . . .*
>
> (2) Provide notice for a public hearing. . . .
>
> (3) Conduct a public hearing . . . [and]
>
> (4) Receive findings and recommendations from any local school improvement council representing an affected school relating to the proposed closure or consolidation prior to or at the public hearing.

W. Va. Code § 18-5-13a(a) (emphasis added). West Virginia Code § 18-5-13a(a)(1)(C) provides that the written reasons must "[c]omply with the rule promulgated pursuant to subsection (b) of this section," *i.e.* Policy 6204. Critically, subsection (b) directs the WVBOE to

> promulgate a rule . . . detailing the type of supporting data a county board shall include as part of its written statement of reason required by this section for school closing or consolidation. The rule shall require *at least* the following data:

20

(1) The transportation time of the affected students; and

(2) Any data required by the state board to amend a county's comprehensive educational facilities plan.

W. Va. Code § 18-5-13a(b) (emphasis added). The statute further directs the WVBOE to promulgate a rule that "establishes the procedure to be followed by county boards when conducting a public hearing on the issues of school consolidation and closing." W. Va. Code § 18-5-13a(c).[18]

This Court has had occasion to examine the operation of West Virginia Code § 18-5-13a as pertains to the power of the WVBOE to approve or reject a CEFP amendment. 184 W.Va. 1, 399 S.E.2d 31. In *Kanawha County Board*, as in this case, the county board challenged the WVBOE's rejection of its consolidation plan. This Court recognized the general authority granted under West Virginia Code § 18-5-13 to county boards to close or consolidate schools, but noted that such authority was made subject to "the rules and regulations of the state board." *Id.* at 2-3, 399 S.E.2d at 32-33 (quoting W. Va. Code § 18-5-13a). The Court then concluded—in sharp contrast to the circuit court's conclusion herein—that "[c]learly, the county boards of education do not have unlimited power to make the final decisions with respect to school closings and consolidation." *Id.* at 3, 399 S.E.2d at 33.

---

[18] *See Jones*, 178 W.Va. at 381, 359 S.E.2d at 609 ("The obvious intent of the [public hearing requirements] of the statute is to insure that the public is aware of and has an opportunity to contribute to the county board's decision regarding consolidating or closing schools.").

Critical to our analysis, however, is this Court's determination in *Kanawha County Board* that county boards' consolidation decisions are both constitutionally and statutorily made subject to the WVBOE's approval. *Id.* The Court discussed its holdings in *Bailey* and *Hechler*, relative to attempted legislative interference in the WVBOE's constitutional powers, and concluded that our precedent has made plain that "by virtue of its constitutional grant of general supervisory powers, the State Board enjoys a special standing in relation to other administrative agencies." *Id.* at 4, 399 S.E.2d at 34. The Court then concluded, unequivocally, that "the State Board does have the authority to review and to approve or disapprove a county board's school closure or consolidation plan" in exercise of its "discretion." *Id.* at 5, 399 S.E.2d at 35. *See also Perry*, 189 W.Va. at 667, 434 S.E.2d at 27 (finding WVBOE has authority to modify local board closure plan "even though the school closure statutes . . . did not expressly so provide.").

As indicated above, the circuit court found that the Legislature "saw fit that the State Board . . . should review, or in other words supervise, school consolidations to determine whether the county boards are following the requirements set forth in W. Va. Code § 18-3-13a [sic]." However, we find nothing in West Virginia Code § 18-5-13a which states or even suggests that the WVBOE's role relative to consolidation is to act as a mere compliance officer. *See Powers*, 318 P.3d at 321 (finding legislation unconstitutional where it "relegates [constitutional officer] to the role of general observer with limited and discrete powers and duties"). Rather, we find that the statute merely sets

22

forth minimum procedural requirements for the county board before proceeding with closure or consolidation.

To that end, we decline the circuit court and Board's invitation to take sides in an artificial conflict between the Legislature and WVBOE; in reality no such conflict exists. The WVBOE's general supervision powers are in no way at odds with the closure and consolidation statute. In fact, the statute expressly delegates to and empowers the WVBOE to promulgate a rule to govern this process. Therefore, far from the fictitious "stand-off" the circuit court urges as between the Legislature and WVBOE's respective constitutional charges, the statute itself appears to acknowledge and pay deference to the WVBOE's expansive rule-making authority in exercise of its supervisory powers. This is undoubtedly because of the Legislature's awareness that "[a]n attempt to undertake the Board's general supervisory powers violates the [separation of powers] provision of art. V, § 1 of the state *Constitution*[.]" *Hechler*, 180 W.Va. at 455-56, 376 S.E.2d at 843.

**B.      *Whether Rejection of CEFP Amendment was Arbitrary or Capricious***

Having determined that the Constitution provides general supervisory authority and the statute itself in no way restricts the WVBOE's role relative to consolidation, we turn then to the regulation promulgated by the WVBOE for closer examination. To that end, the circuit court found, and the Board argues, that the WVBOE failed to restrict its consideration of the CEFP to the "factors" and "criteria" contained within Policy 6204; therefore, its actions were necessarily arbitrary and

23

capricious.[19] The Board argues that none of the reasons for rejection articulated during the formal motion or in subsequent member testimony are mentioned specifically in the six categories of information outlined in Policy 6204.[20] Accordingly, the circuit court concluded that the WVBOE's rejection of the CEFP is therefore arbitrary because it involves matters "the Legislature did not intend them to consider[.]"

---

[19] *See* Section III(B)(2), *infra*.

[20] As indicated hereinabove, Vice President Perry's motion to reject the CEFP amendment was based upon the Board's failure to explore other alternatives. His motion at the second hearing was based upon additional factors including lack of meaningful dialogue with the community, declining population in Nicholas County High School area, potential utilization of technology, and student achievement. These reasons were officially proffered in support of the WVBOE's rejection of the amendment as required by syllabus point 4 of *Kanawha County Board*:

> Where the West Virginia Board of Education rejects, in whole or in part, a county board of education's school closure or consolidation plan, it is required to state its reasons for doing so. The State Board need not make detailed findings of fact or conclusions of law, but must give some reasons for its action so as to enable a reviewing court to determine if it has abused its discretion.

184 W.Va. 1, 399 S.E.2d 31.

The circuit court subsequently took testimony from each WVBOE member who voted to reject the amendment, which testimony elaborated on the reasons each member personally voted to reject. We question the propriety of the circuit court's intrusion into the individual members' deliberative processes and the relevancy of that testimony to the formally-articulated bases for the WVBOE's rejection of the amendment as a body. "It has long been admonished that 'court's [sic] may not accept . . . *post hoc* rationalizations for agency action.'" *Webb v. W. Va. Bd. of Med.*, 212 W.Va. 149, 158, 569 S.E.2d 225, 234 (2002) (quoting *Burlington Truck Lines, Inc. v. U. S.*, 371 U.S. 156, 168-69 (1962). However, given that the members' testimony was largely concordant with the reasons provided by the body, we decline to delve deeper into any restrictions on the evidence which the circuit court should have considered in evaluating whether the WVBOE's action was arbitrary and capricious.

The WVBOE, however, argues that the language of Policy 6204 clearly contemplates submission of the plan for its consideration on the merits and consequent approval or rejection. Moreover, the WVBOE argues that all of the reasons proffered for rejection of the plan pertain to "educational policy" concerns and therefore relate in some manner to the areas outlined in Policy 6204, if not expressly, at least implicitly. Accordingly, a closer look at the language of Policy 6204 is necessary to determine if the WVBOE acted arbitrarily or capriciously.

1.      CEFP Amendment Considerations pursuant to Policy 6204

As indicated above, West Virginia Code § 18-5-13a(b) directs the WVBOE to promulgate a rule which "detail[s] the type of supporting data a county board shall include as part of its written statement of reason[.]" The rule promulgated by the WVBOE is contained at West Virginia Code of State Regulations §§ 126-176-1 *et seq.* and, as previously stated, is known as Policy 6204. Policy 6204 is explicitly designated a "Procedural Rule" and states that it sets the requirements for the local board "in proceeding with a potential school closing or consolidation[.]" W. Va. C.S.R. § 126-176-1.1. Notably, West Virginia Code § 29A-1-2(h) (2015) defines a procedural rule as one which "fixes rules of *procedure, practice or evidence* for dealings with or proceedings before an agency, including forms prescribed by the agency." (emphasis added).

Section two of Policy 6204 is entitled "County Procedures" and provides that "[t]he county board must prepare and reduce to writing, *reasons and supporting data*

25

concerning proposed school closings or consolidations *to be submitted to the [WVBOE] for approval* in accordance with this policy and the West Virginia Code."  W. Va. C.S.R. § 126-176-2.1 (emphasis added).  Section 2.2 further provides that the written consolidation plan must provide an executive summary including "items" thereafter listed concerning the following six topics:  enrollment, facilities, finance, personnel, transportation, and educational program[s].[21]  W. Va. C.S.R. § 126-176-2.2.  The Policy likewise sets forth the procedures to be utilized in conducting the public hearings required.  W. Va. C.S.R. §§ 126-176-2.3 through 2.4.  Following the hearings, the local board must take a formal vote on the closure or consolidation.  W. Va. C.S.R. § 126-176-2.4.4.

Critically, after the vote and prior to implementation of any consolidation, section 2.6 states that "the county must file a request for an amendment of it's [sic] CEFP with the WVBE *for approval*[.]" (emphasis added).  The request must "contain *justification* for the proposed consolidation" which "must be supported by *supplemental data and information* pertinent to the following subjects:  enrollment, facilities, finance, personnel, transportation, and educational programs[.]" W. Va. C.S.R. § 126-176-2.6.3

---

[21] The types of information specifically described in the list of six topics include such matters as:  trends in student population and attendance area, enrollment projections, census data, maps, physical appraisal of targeted schools, utilization factors, accessibility, anticipated costs or savings for the affected schools, renovation costs, effects on personnel, negative variances from transportation standards, and projected educational program improvement for exceptional students, distance learning, and vocational and special education students.  W. Va. C.S.R. §§ 126-176-2.2.1 through 2.2.6.

26

(emphasis added).  Of no small moment is the fact that a prior version of Policy 6200 (the

*Handbook on Planning School Facilities*) expressly provided that the WVBOE

> will *not* overrule a county board of education on a school closing or consolidation matter, unless the proposal does not comply with the educational and facility standards established by the State Board or the county board has not complied with procedural requirements of 18-5-13, 18-5-13a, and State Board Policy.

W. Va. C.S.R. § 126-182-1 (1985) (emphasis in original).  That provision was *deleted*

from Policy 6200 in 1991 and has remained absent from Policy 6200 and 6204 to date.[22]

Under any reasonable reading of Policy 6204, it plainly contemplates the

WVBOE's discretionary approval of a CEFP amendment and attendant consolidation

plan.  First, Policy 6204 expressly provides that both the written consolidation plan and

the CEFP amendment are *subject to approval* by the WVBOE and must contain a

---

[22] Significantly, this provision was contained in Policy 6200 at the time of this Court's decision in *Kanawha County Board*.  In fact, it was the language of this provision regarding compliance with procedural requirements and WVBOE regulations which was mirrored in the Court's holding.  In particular, syllabus point one of *Kanawha County Board* provides that decisions on closure or consolidation "may be rejected where they fail to comply with statutory provisions or West Virginia Board of Education regulations."  184 W.Va. 1, 399 S.E.2d 31, syl. pt. 1.  The Board argues that this language indicates that a consolidation plan may therefore *only* be rejected for statutory or regulatory non-compliance.  As discussed more fully *infra*, there is nothing in the statute or regulations suggesting that the WVBOE's rejection of a consolidation plan is limited to only those reasons, nor does the syllabus point itself indicate as much.  Focusing primarily on the subordination of the county board to the WVBOE, the *Kanawha County Board* case simply did not explore the parameters of the WVBOE's discretion relative to Policy 6200 or 6204 because of the existence of the above-quoted, self-limiting language.

"justification" for the closure. There is simply nothing in the statute or Policy which suggests that once a local board jumps through the hoops of information-gathering for purposes of the written plan and CEFP amendment, the blessing of the WVBOE is guaranteed. In fact, the WVBOE's removal of the provision from the *Handbook on Planning School Facilities* stating that it would not overrule a county board's closure or consolidation decision absent procedural irregularities clearly demonstrates the WVBOE's intention to utilize its broad discretion in approving or rejecting such a plan.[23] Under any common-sense reading of Policy 6204, subjective assessment of the merits of the plan by the WVBOE is understood.

More importantly, we find the circuit court and Board's characterization of the six categories enumerated in Policy 6204 as "criteria" or "factors" to be wildly inaccurate. Section 2.6 of Policy 6204 requires that the request for CEFP amendment must be accompanied by a justification for the proposed consolidation which "must be supported by *supplemental data and information* pertinent to the following subjects: enrollment, facilities, finance, personnel, transportation, and education programs[.]" W. Va. C.S.R. § 126-176-2.6.3 (emphasis added). West Virginia Code § 18-5-13a(b)

---

[23] Accordingly, the Board's suggestion that it was effectively blind-sided by the far afield considerations of the WVBOE is meritless. Removal of this language signals to even a layperson that the WVBOE no longer intended to be constrained by this provision and could "overrule" a plan even if it met procedural requirements. Further, the Board's dismissive treatment of the significance of this amendment is particularly disingenuous given its insistence that *only an amendment* of Policy 6204 would enable the WVBOE to expand the outer perimeter of matters which it may consider relative to consolidation.

similarly states that the content of a rule promulgated by the WVBOE must "detail[] the type of *supporting data* a county board shall include as part of its written statement of reason required by this section for school closing or consolidation." (emphasis added).

Therefore, the six "criteria" or "factors" that the circuit court found binding on the WVBOE are merely categories of "supporting data" as per the language of the statute and Policy 6204. None of these categories or the specific supporting data described thereunder contains any "criteria" or objective benchmarks which, once met, would suggest subsequent approval was implicit. Moreover, nothing in Policy 6204 so much as suggests that the WVBOE's approval or rejection of a CEFP amendment is limited to issues arising from these categories of data.

In fact, the entire process effectively *requires* the WVBOE to engage in a holistic effort to subjectively assess whether the information collected pursuant to the statute and Policy 6204 actually justifies consolidation or closure. The vast amount of "supporting data" required under Policy 6204 is not self-justifying; rather, it begs for analysis. The completion and delivery of the written plan and supporting data are simply procedural requirements—as per Policy 6204 itself—which provide an administrative process for submission of a consolidation plan, which procedure culminates in the WVBOE's review necessary for approval of the county board's plan. The necessity of detailed procedural requirements to guide county boards through this important process is obvious. *See Pell v. Bd. of Educ. of Monroe Cty.*, 188 W.Va. 718, 72 n.2, 426 S.E.2d

29

510, 513 n.2 (1992) ("[A]pproving a plan of closure or consolidation is not something that can be accomplished overnight, but is a protracted ordeal so as to ensure a more contemplative analysis before such a major decision is made."). Nevertheless, the detail provided in outlining the process, information, and administrative requirements necessary to effectuate consolidation does not serve to extend Policy 6204 beyond its intended reach of simply governing procedure.

Finally, as a practical matter, this Court can discern no other reason for submission of the supporting data to the WVBOE than for its consideration in approving or rejecting the plan. Under the circuit court's reasoning, a county board could theoretically prepare a plan that was neither fiscally nor educationally sound, yet insofar as the county board thoroughly and properly assembled supporting documentation for such a plan, the WVBOE would be bound to approve the consolidation. We are unpersuaded by the Board's argument that to the extent that the reasons for rejection could in some measure be tied to one of the six enumerated categories of supporting data and information, rejection may be proper. Such a standard is plainly susceptible to semantical games designed to pigeon-hole the entire universe of potential reasons for rejection of very situation-specific plans into blunt categories which are by no means intended to be comprehensive standards for the evaluation of the propriety of school closure or consolidation. The critically important decision-making involved in protecting our children's fundamental right to education is antithetical to such gamesmanship. The WVBOE's constitutional duty to the "complete executive delivery and maintenance of a

30

thorough and efficient" educational system demands more.  Syl. Pt. 1, *Pauley*, 174 W. Va. 167, 324 S.E.2d 128.  Therefore, the West Virginia Board of Education is entitled to utilize its discretion in approving or rejecting an amendment to a Comprehensive Educational Facilities Plan submitted pursuant to West Virginia Code of State Regulations §§ 126-176-1 *et seq.* (2005) in aid of school closure or consolidation.

2.       Arbitrariness or Capriciousness of the WVBOE's Reasons for Rejection

Notwithstanding the constitutional, statutory, and regulatory authority we find hereinabove, by no means does this Court suggest that the WVBOE's discretion in this regard without limitation.  As indicated above, mandamus will lie to "control a board of education in the exercise of its discretion" where there is a showing of "caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of law upon the part of such board."  Syl. Pt. 1, *State ex rel. Payne v. Bd. of Educ. of Jefferson Cty.*, 135 W.Va. 349, 63 S.E.2d 579 (1950).  *See also* Syl. Pt. 1, *Detch*, 145 W. Va. 722, 117 S.E.2d 138 ("The determination of the educational policies of the public schools of the State is vested in The West Virginia Board of Education, and, unless *unreasonable* or *arbitrary*, its actions relating to such policies will not be controlled by the courts." (emphasis added)).  Therefore, although we reject the basis for the circuit

court's conclusion that the WVBOE acted arbitrarily and capriciously, we nonetheless find it prudent to utilize our plenary powers to examine the reasons stated.[24]

As indicated above, multiple members of the WVBOE expressed concern that the public hearings conducted were perfunctory and failed to address issues and concerns raised. Certain members expressed their view, with the support of educational research, that community schools better serve impoverished students, of which Richwood has a high number. Certain members expressed concern that the Board had not adequately addressed or considered the impact of consolidation on discipline and extracurricular activities, as pertains to the well-being of the student body and educational environment. Nearly all members expressed concern that alternatives which would better address the foregoing issues were not sufficiently demonstrated to have been considered by the Board. Nearly all members expressed that all of the affected schools were doing well academically and financially and that, typically, consolidation is utilized to improve upon either or both. The common theme in the members' testimony was that they were concerned about consolidation given Richwood's high number of impoverished families and the ample research suggesting that such students do not thrive in a larger school setting. President Campbell and Member Debra Sullivan gave

---

[24] As detailed in n.11, *supra*, the circuit court made passing reference to the Governor's stated preference for the schools to remain in Richwood which it found "lend[ed] support to the . . . theory [that] WVBE members constructed arbitrary and pretextual justifications to deny the . . . CEFP amendment." However, we find no evidence whatsoever that the Governor interfered in the WVBOE's deliberate process, such as to render their reasons for rejection "pretextual."

thoughtful and extensive testimony explaining that educational research is now trending away from consolidation in favor of community schools as being optimal, particularly for impoverished students, where the schools at issue are performing so well academically and financially, as these schools are.

Without passing on the relative merits of any of the WVBOE members' testimony, we find that the thoughtful and well-supported rationales offered by the WVBOE members objectively pertain to the feasibility, desirability, and efficacy of consolidation. Accordingly, we find no basis upon which to cast their reasoning as arbitrary or capricious; rather, their reasoning was unified, well-expressed, and, above all, plainly germane to the wisdom of consolidation and the well-being of the student population. We therefore find that the circuit court erred in concluding that the WVBOE's rejection of the CEFP amendment was arbitrary and/or capricious. [25]

---

[25] The WVBOE tangentially argues a jurisdictional issue that we may dispense with in short order. Specifically, the WVBOE maintains that the circuit court lacked personal jurisdiction over it because it was not properly served with process. While the WVBOE was served in accordance with the manner provided in West Virginia Rule of Civil Procedure 4, no summons was issued; therefore it claims that the circuit court never obtained jurisdiction over it. It takes the position that by virtue of the applicability of the Rules of Civil Procedure to extraordinary writs, a "rule to show cause" no longer exists and all extraordinary remedies must be served in accordance with the Rules of Civil Procedure, including but not limited to the issuance of a summons.

While the Rules of Civil Procedure are made expressly applicable to extraordinary writs by virtue of the Court's 1998 enactment of Rule 71B of the Rules of Civil Procedure, there is no merit to the WVBOE's contention that Rule 4 supplants the statutory procedure for extraordinary writs. The WVBOE apparently overlooks West Virginia Rule of Civil Procedure 4.1(a) which was enacted at the same time the Rules (continued . . .)

33

As this Court aptly stated in *Jones*, "neither we nor the circuit court can substitute our judgment on this issue for that of the professional educators and administrators charged with the promulgation and implementation of state educational policy." 178 W. Va. at 380, 359 S.E.2d at 608. Moreover,

> it is not this Court's duty to legislate; nor were we elected to make political decisions based upon what we believe to be the expedient answer to this situation. Instead, we are charged with the task of interpreting the Constitution and the laws of this State as they exist. A judicial system that substitutes its beliefs for the constitutional principles of its people is a mockery of justice.

*Meadows on Behalf of Prof'l Emps. of W. Va. Educ. Ass'n v. Hey*, 184 W.Va. 75, 77, 399 S.E.2d 657, 659 (1990). While this Court is sensitive to the deeply-held beliefs and difficult decisions faced by all parties to this situation, we are duty-bound to faithfully apply this Court's precedent to resolve these complex issues of constitutional magnitude.

---

were made applicable to extraordinary writs. Rule 4.1(a) provides, in part, that "[w]henever an order of court provides for service of a *rule*, or order in lieu of summons or a rule, upon a party, service shall be made in the manner provided in Rule 4(d), unless the order prescribes a different mode of service." (emphasis added). Rule 4(d) merely outlines the various methods of service. Therefore, Rule 4.1 was plainly enacted to "fill the gap" for service of process of an extraordinary writ and by no means necessitates the issuance of a summons to properly effect service of a rule to show cause. As such, WVBOE's argument in this regard is entirely without merit.

## IV. CONCLUSION

For the reasons set forth hereinabove, we reverse the August 18, 2017, order of the Circuit Court of Kanawha County, West Virginia.

Reversed.