No. 22-616 – *State of West Virginia, Katie Switzer and Jennifer Compton v. Travis Beaver, Wendy Peters, David L. Roach and L. Paul Hardesty*

**FILED**
**November 18, 2022**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WOOTON, Justice, concurring:

I concur in the Court's conclusion that the Hope Scholarship Act, W. Va. Code §§ 18-31-1 to -13, is not facially unconstitutional. Whatever my personal views as to the wisdom of this legislation – and indeed, I share many of the concerns discussed in the circuit court's opinion – it is well established that "[t]his Court does not sit as a super-legislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation." Syl. Pt. 2, in part, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 679 S.E.2d 323 (2009). In that regard,

> "the legislators who enacted the [Hope Scholarship Act] were elected by the people and are answerable to them; '[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process.' *Cooper*,[1] 229 W. Va. at 615, 730 S.E.2d at 398, quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)."

*Morrisey v. W. Va. AFL-CIO*, 243 W. Va. 86, 127, 842 S.E.2d 455, 496 (2020) (Workman, J., concurring, in part, and dissenting, in part); see also *MacDonald v. City Hosp., Inc.*, 227

---

[1] *State ex rel. Cooper v. Tennant*, 229 W. Va. 585, 730 S.E.2d 368 (2012).

1

W.Va. 707, 722, 715 S.E.2d 405, 420 (2011) ("'judicial challenge "is not a license for [this Court] to judge the wisdom, fairness, or logic of legislative choices.'") (citation omitted).

I write separately to note my concern that the ambiguous language of West Virginia Code section 18-31-8(f) could raise a constitutional issue separate and apart from whether the statute "requires a student to trade away their public education for a 'sum of money.'"[2] The statute establishes a mechanism by which Hope Scholarship students may take classes or participate in extracurricular activities at a public school, as well as a mechanism for reimbursement to a school district in which Hope Scholarship students have done so.[3] The statute provides that

> [t]he [Hope Scholarship] board, in consultation with the Department of Education, may adopt rules and policies for Hope Scholarship students who want to continue to receive services provided by a public school or district, including individual classes and extracurricular programs, in combination with an individualized instructional program. The [Hope Scholarship] board, in consultation with the Department of Education, shall ensure that any public school or school district providing such services receives the appropriate pro rata share of a student's Hope Scholarship funds based on the percentage of total instruction provided to the student by the public school or school district. County boards shall charge tuition to Hope Scholarship students who enroll for services in

[2] I agree with the majority that this argument fails because the Hope Scholarship program is entirely voluntary; a Hope student may re-enroll in public school at any time.

[3] In this regard, the Act specifies that a Hope Scholarship student may use his or her education-savings account for specific purposes, including "[o]ngoing services provided by a public school district pursuant to § 18-31-8(f) of this code, including without limitation, individual classes and extracurricular activities and programs. *Id*. § 18-31-7(a)(1).

> a public school within the county. Hope Scholarship students who enroll for services part-time in public school shall not be included in net enrollment for state aid funding purposes under § 18-9A-2 of this code. Nothing in this subsection prohibits a Hope Scholarship student from using the funds deposited in his or her account on both services provided by a public school or district and other qualifying expenses as provided for in § 18-31-7 of this code.

*Id*. § 18-31-8(f).

The language of this statute raises a host of questions. First, and fundamentally, the provisions of § 18-31-8(f) are internally inconsistent and impossible to reconcile. The statute initially provides that the amount of reimbursement due to a public school or school district that has provided services to a Hope Scholarship student is to be governed by the *ratio* of those services to the total educational services, private and public, the student has received. Presumably such a ratio would be determined by a simple mathematical calculation, leading one to wonder what sort of "consultation" between the Hope Board and the Department of Education ("the DOE") is necessary. In the very next sentence of the statute, however, county school boards are required to charge *tuition* for the public-school services, which would seem to indicate that there's no ratio involved in determining reimbursement; the tuition rate is the cost of the public-school services, and Hope Scholarship students can determine whether they are willing to pay those costs from their scholarship funds.

Additional questions abound as well. What exactly is the role of the DOE in its consultation with the Hope Board regarding "rules and policies for Hope Scholarship students who want to continue to receive services provided by a public school or district"? Does it have veto power over the Hope Board's proposed rules and policies if it finds them to be misguided, unworkable, inimical to the educational needs of public-school students and/or Hope Scholarship students, or otherwise ill-advised? If not, does the Hope Board just forge ahead anyway, i.e., make and enforce its rules and policies regardless of the DOE's objections? Second, what exactly are the respective roles of the DOE and the Hope Board in determining that a public school or school district receives the "appropriate pro rata share" of a participating Hope Scholarship student's award? Does the DOE have to enter into some sort of negotiation with the Hope Board in order to get paid for the services provided by public schools to the Hope Scholarship students? What happens if the two sides can't agree on what's "appropriate"? And how does the set rate of tuition figure into all this? *See* text *supra*. Third, do each of the fifty-five county boards determine the tuition rate for services provided to Hope Scholarship students in their schools (which would be a gilt-edged invitation to an equal protection challenge), or is their function simply ministerial, i.e., sending out the bills? And bills for what? If the county boards don't determine the tuition rate, who does? The State Board of Education ("the State Board")? The DOE? The Hope Board? The Legislature?

A significant constitutional issue may well exist here, depending on the answers to the above questions, and none of those answers are readily apparent from the language of the statute.

Article XII, Section 2 of the West Virginia Constitution provides in relevant part that "[t]he general supervision of the free schools of the State shall be vested in the West Virginia Board of Education, which shall perform such duties as may be prescribed by law." To aid in carrying out its constitutional and statutory duties and responsibilities, the State Board "shall, in the manner prescribed by law, select the state superintendent of free schools[,]"[4] *id.*, who in turn "shall maintain a Department of Education at his office at the state capitol, and he shall have authority to employ assistants and such other employees as may be necessary." W. Va. Code § 18-3-9. Thus, any diminution of the authority of the DOE is a dagger thrust into the heart of the State Board and the State Superintendent, whose duties of general supervision are constitutionally grounded.

In this regard, this Court held in *W. Va. Bd. of Educ. v. Bd. of Educ. of the Cnty. of Nicholas*, 239 W. Va. 705, 806 S.E.2d 136 (2017) that the

---

[4] *See Pauley v. Bailey*, 174 W. Va. 167, 168, 324 S.E.2d 128, 129 (1984), Syl. Pt. 1, in part ("The West Virginia Board of Education and the State Superintendent of Schools, pursuant to their general supervisory powers over education in West Virginia under *W.Va. Const.* art. XII, § 2, and their specific duties to establish, implement and enforce high quality educational standards for all facets of education under the provisions of Chapter 18 of the West Virginia Code, have a duty to ensure the complete executive delivery and maintenance of a 'thorough and efficient system of free schools' in West Virginia[.]"

[g]eneral supervision" is not an axiomatic blend of words designed to fill the pages of our State *Constitution*, but it is a meaningful concept to the governance of schools and education in this state. Decisions that pertain to education must be faced by those who possess expertise in the educational area. These issues are critical to the progress of schools in this state, and, ultimately, the welfare of its citizens. In 1957, the citizens of this state conferred general supervisory powers over education and one need not look further than art. XII, § 2 of the State *Constitution* to see that the "general supervision" of state schools is vested in the State Board of Education. Unlike most other administrative agencies which are constituents of the executive branch, the Board enjoys a special standing because such a constitutional provision exists.

*W. Va. Bd. of Educ.*, 239 W. Va. at 713, 806 S.E.2d at 144 (citing *W. Va. Bd. of Educ. v. Hechler*, 180 W.Va. 451, 455, 376 S.E.2d 839, 842-43 (1988). Further demonstrating the critical importance of the powers and duties of our State's educational institutions, and their constitutional basis, "this Court has unequivocally held that legislative action that impedes the general supervisory powers of the [board] is patently unconstitutional[,]" *W. Va. Bd. of Educ.*, 239 W. Va. at 713-14, 806 S.E.2d at 144-45, and that "[t]he determination of the educational policies of the public schools of the State is vested in the [state board], and, unless unreasonable or arbitrary, its actions relating to such policies will not be controlled by the courts." Syl. Pt. 1, *Detch v. Bd. of Ed.*, 145 W. Va. 722, 117 S.E.2d 138 (1960).

In short, the Legislature cannot diminish the powers and duties of the State Board by authorizing the Hope Board to share in those powers and duties; yet West Virginia Code section 18-31-8(f) can be read to do just that. If the Hope Board is authorized

to establish education-related rules and regulations that have been disapproved by the DOE – rules that involve *public school classes and extracurricular activities* made available to Hope Scholarship students – this would violate the legal precept that "'[r]ule-making by the State Board of Education is within the meaning of 'general supervision' of state schools pursuant to art. XII, § 2 of the *West Virginia Constitution,* and any statutory provision that interferes with such rule-making is unconstitutional....'" Syl. Pt. 2, *Bd. of Educ. of Cnty. of Kanawha v. W. Va. Bd. of Educ.*, 184 W. Va. 1, 399 S.E.2d 31 (1990) (quoting *Hechler*, 451 W. Va. at 452, 376 S.E.2d at 839, Syl. Pt. 2, in part). Further, if the Hope Board is authorized to negotiate with the DOE over what constitutes the "appropriate pro rata share" of funds to be reimbursed to a school district that has provided services to Hope Scholarship students – services for which a set tuition rate has been established[5] – then the Board is exercising authority that it does not, and can never, have: the authority to reduce expenditures for public education. *See* Syl. Pt. 2, in part, *State ex rel. Bd. of Educ. of Kanawha Cnty. v. Rockefeller*, 167 W. Va. 72, 281 S.E.2d 131 (1981) ("Because of public education's constitutionally preferred status in the State, expenditures for public education cannot be reduced . . . in the absence of a compelling factual record to demonstrate the necessity therefor.").

---

[5] As noted *supra*, West Virginia Code section 18-31-8(f) is silent as to the mechanism for establishing this rate; however, the most reasonable inference to be drawn from the statutory language is that each county school board does so for the schools in that county.

All this being said, this Court has held repeatedly that "[e]very reasonable construction [of a legislative enactment] must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question." Syl. Pt. 1, in part, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965). Because West Virginia Code § 18-31-8(f) can be read as establishing a mechanism for consultation between the Hope Board and the DOE that does not encroach on the constitutional powers and duties of the State Board, I concur with the Court's judgment that the Hope Scholarship Act, West Virginia Code §§ 18-31-1 to -13, is not facially unconstitutional. Only time will tell whether the Act, or any of the provisions thereof including § 18-31-8(f), is subject to an as-applied challenge.

For these reasons, I respectfully concur.